[No. 31069.   *En Banc.*   January 17, 1950.]

*In the Matter of the Estate of* GUSTAV OSKAR SODERSTRAN,
*Deceased.*

JUHO LEONARD TUURAS *et al., Respondents,* v. F. M. CORNELL,
*as Executor, Appellant.*[1]

*Heideman, Flanagan & Russell,* for appellant.

*Stanley C. Soderland,* for respondents.

[1]Reported in 213 P. (2d) 949.

BEALS, J.—July 22, 1948, F. M. Cornell filed in the office of the clerk of the superior court for King county a document purporting to be the will of Gustav Oskar Soderstran, together with his petition that the writing be admitted to probate as Mr. Soderstran's will. On the same day, the document was presented to the superior court, testimony was taken, and an order signed and filed admitting it to probate.

By the terms of the will, Mr. Soderstran devised and bequeathed all of his property (with the exception of a bequest of one hundred dollars) to the petitioner, F. M. Cornell, naming him executor of the will, without bond, and directing that the will be executed without the intervention of the court.

August 21, 1948, J. L. Tuuras, Elsa Glade, and Selma Nyyssanen, nephew and nieces of the deceased, on their own behalf and on behalf of other unnamed heirs at law of the deceased, filed their petition contesting the will and praying that the probate thereof be revoked. The petitioners alleged that, at the time of the execution of the document above referred to, Mr. Soderstran was mentally incompetent and lacked testamentary capacity. It was also alleged that the deceased was induced to execute the document by undue influence exerted upon him by Mr. Cornell and other persons.

Mr. Cornell filed his answer to the petition, denying the allegations therein contained and asking that the petition contesting the will be dismissed.

The issues presented by the pleadings came on regularly for trial during the month of January, 1949, with the result that, February 25, 1949, the court entered a decree sustaining the position of the contestants and revoking the decree admitting the will to probate, upon the ground that the document "was not the free and voluntary will of the decedent Gustav Oskar Soderstran, but resulted from the undue influence of the beneficiary thereof, F. M. Cornell, and others." The decree signed by the court also contained the following:

"The court finding that the decedent in this case, Gustav Oskar Soderstran, was a man 92 years of age, who had living heirs at law, and who had prior to December 22, 1947 executed a will in favor of one Emil Koskinen, which will was in existence on that date.

"The court further finding that on December 22, 1947 the decedent, Gustav Oskar Soderstran, did have testamentary capacity and was not mentally incompetent to make a will, but that he was old, tired, and infirm, was in a weakened mental and physical condition, was eccentric; and that he had poor judgment and could be easily influenced; . . ."

From this decree, Mr. Cornell has appealed to this court.

Thereafter, the court signed an order removing Mr. Cornell as executor and appointing G. Robert Brain administrator of the estate.

Appellant makes the following assignment of errors:

"The Trial Court erred in:

"(1) Failing to dismiss respondents' petition on appellant's motion at the conclusion of respondents' case.

"(2) Setting aside the will of Gustav Oskar Soderstran.

"(3) Holding that Gustav Oskar Soderstran was subjected to the undue influence of F. M. Cornell and others in connection with the execution of his will dated December 22, 1947.

"(4) In revoking appellant's Letters Testamentary upon the Estate of Gustav O. Soderstran."

The will which the trial court set aside was executed at Seattle, December 22, 1947. Mr. Soderstran, the testator, died in Seattle, July 18, 1948, at the age of ninety-two years. He left an estate of the approximate value of ten thousand dollars, the major portion thereof consisting of a six-unit apartment building at 118 west Republican street, Seattle. Mr. Soderstran occupied one of the apartments as his home, having owned the building for more than twenty years. He had been twice married, but had been a widower for several years. He was born in Finland, and understood English, which he spoke rather brokenly. It appears that he could read English, as for some years he subscribed to a Seattle daily newspaper, which he read. By his will, he bequeathed one hundred dollars to a "stepgrandson." Apparently, he

had no blood relatives more nearly related than nephews and nieces, some of whom resided in the eastern part of the United States and some in Finland.

During the year 1944, one Emil Koskinen, a Finn, moved into one of the units in Mr. Soderstran's building, paying a very low rental of ten dollars a month therefor. A short time thereafter, Mr. Soderstran executed a will, written in longhand by Mr. Koskinen, by the provisions of which Koskinen was named as sole devisee. There was testimony to the effect that, during the year 1945, Koskinen ceased paying rent for his unit, and commenced collecting rentals from the other tenants. At the time the will referred to was executed, it was evidently the understanding that Koskinen would care for Mr. Soderstran. Considerable testimony was introduced concerning this relationship between the parties, some witnesses testifying that Koskinen had taken good care of Mr. Soderstran, while others testified that the old gentleman was neglected, referring to specific instances. Witnesses called by respondents testified that Mr. Soder- stran's apartment was kept clean and neat, while other witnesses testified that the apartment was filthy.

It appears that Mr. Soderstran was occasionally absent-minded and forgetful, and, at times, acted peculiarly, failing to recognize old friends, and giving other evidences of some mental deterioration.

F. M. Cornell was a friend of Mr. Soderstran, and was one of the witnesses to the will in Koskinen's favor. Mr. Soder-stran gradually came to depend upon Mr. Cornell for care, rather than upon Koskinen, who testified that, during the fall of 1946, Mr. Soderstran became angry with him, accusing him of stealing money. The witness Henry Meitmann testified that, in November, 1947, Mr. Soderstran told him that Koskinen had stolen money from him.

During the month of December, 1947, Mr. Soderstran executed a power of attorney in favor of Mr. Cornell, the latter then telling Koskinen to vacate the apartment and stating that this was by Mr. Soderstran's directions.

Mr. Koskinen testified on the trial as a witness for respondents, stating that he had filed a claim against the estate in the sum of $2,450 for services rendered, and that respondents had promised him that, if they prevailed in the action, they would see that he was paid for the services which he claimed to have rendered to Mr. Soderstran.

The case was closed January 28, 1949, the court then stating that an oral opinion would be delivered from the bench at the opening of court January 31st. At the time specified, the trial court delivered a comprehensive oral summation of the evidence, which is contained in twelve pages of the statement of facts. The court stated that, at the time of the execution of the will, Mr. Soderstran enjoyed testamentary capacity, but that, in the court's opinion, the will in Cornell's favor was procured by the exercise of undue influence upon the testator.

█ We agree with the trial court that, from the evidence, it appears that Mr. Soderstran enjoyed testamentary capacity at the time of the execution of the will in question.

██ The burden then rested upon respondents to prove that the will which had been admitted to probate was procured by the exercise of undue influence upon the testator. In order to set aside a will upon the ground that the testator had been subjected to undue influence, the evidence of such undue influence must be clear, cogent, and convincing. *Dean v. Jordan,* 194 Wash. 661, 79 P. (2d) 331.

Examination of the record discloses no direct evidence concerning the exercise of any influence over Mr. Soderstran by Mr. Cornell, or by anyone else who sought to induce Mr. Soderstran to make a will in Mr. Cornell's favor. No witness testified as to the exercise of any such influence whatever at the time of the execution of the will. There was some evidence that Mr. Soderstran had made one or more wills prior to the time that he made the will in favor of Mr. Koskinen, but it does not appear who would have benefited thereby. It was evidently his desire to leave his property to some friend or friends who had been kind to him and rendered the services which were necessary to him,

due to his great age and bodily infirmities. Some of the witnesses testified that, at times, he spoke of leaving his property to some Lutheran church, but, apparently, this was never more than a passing thought.

Fifteen witnesses testified before the trial court concerning the subject matter of this action. Seven of these witnesses were called by respondents, in addition to the physician who had attended Mr. Soderstran. Six witnesses were called by appellant, in addition to Arthur B. Langlie, Esquire, who had prepared the will which was admitted to probate.

The will which Mr. Soderstran had executed in Koskinen's favor was introduced as an exhibit. This will was witnessed by Mr. Cornell and by Nellie Wylie, who also was a witness to the will here in question and who was called as a witness by appellant.

The greater portion of the testimony of respondents' witnesses concerned Mr. Soderstran's mental condition, and was introduced for the purpose of showing that, at the time he executed the will which was admitted to probate, he lacked testamentary capacity.

The trial court definitely decided this question against respondents' contention, and we are in full accord with the trial court in its formal order covering this phase of the case.

Dr. C. W. Silverberg, Mr. Soderstran's physician, was called as a witness by respondents. The doctor testified that he was first called to attend the patient during the month of January, 1947; that he had not been acquainted with him prior to that date; that Mr. Soderstran was then suffering from lumbar pneumonia and a bad cold; that the doctor found him in the kitchen, lying upon some planks resting on chairs near the stove, and that he refused to go to the hospital. So far as the witness was able to learn from Mr. Koskinen, the sick man "wanted to have it that way," and refused to have an electric heater in the apartment because it would be too expensive. The doctor testified that, at that time, the patient had symptoms of "senile dementia de-

memoration," and that it was hard to communicate with him because of his deafness.

Mr. Soderstran evidently regained his health, and the witness did not see him again until December 22, 1947, when he was called to attend Mr. Soderstran. On the occasion of this visit, one or two women and Mr. Cornell were present in Mr. Soderstran's apartment, and Mr. Langlie was also present. The witness suggested hospitalization, but the patient would not agree. However, he was hospitalized the next day, following another visit by the doctor, who stated that Mr. Soderstran was very ill, the witness fearing that he might develop pneumonia, which did appear after the patient was hospitalized. Mr. Soderstran recovered from the pneumonia, but fell and broke his leg, and remained in the hospital until his death, which occurred about six and one-half months later. During this period, the witness saw the patient almost every day. The doctor testified that Mr. Soderstran was a difficult patient, in that he would not obey orders. Concerning his visit in December, 1947, the doctor testified as follows:

"Q. At the time you observed him in Mr. Cornell's apartment when you came to treat him and when Mr. Langlie was just leaving, would you say that he was in a weakened condition or not? A. He was, of course— He had fever and he was ill. I believe, though, that he was able to distinguish between right and wrong, at least, and probably knew what he wished to have done. Q. You say he was in a condition where he could be influenced easily or not? A. Yes, I believe that he could be influenced, because the way I understand, there was some conniving and suggestions— pressure to bear to make a will. I don't know. That is only hearsay. I understand that was carried out. Q. You observed his condition? A. Yes. Q. From his condition you would say he was in a condition to be subject to that? A. Yes. MR. RUSSELL: If Your Honor please,— A. Any man of his age in his physical condition, under which he was laboring, I think he was subjected to suggestion. MR. RUSSELL: If Your Honor please, I'd like to have the answer to the last question stricken. THE COURT: It may be stricken, that part. The court can decide that matter, whether he was influenced or not. That is a question for the court to determine from the testimony. MR. SODERLAND: Yes, I guess you're right."

Dr. Silverberg testified at considerable length concerning Mr. Soderstran's condition during the doctor's visits in December, 1947, and while he was in the hospital.

Mr. Langlie, called as a witness by appellant, testified that, December 22, 1947, he received from Mr. Cornell, over the telephone, a request to go to 118 west Republican street to draw a will for an elderly man; that the witness went to that address, met Mr. Cornell, and was taken to a room, where he met Mr. Soderstran and a lady, and that Mr. Soderstran stated that he desired to make his will. Mrs. Ellen Howe, an old friend of Mr. Soderstran, who was of Finnish descent and spoke that language fluently, acted as interpreter when necessary. Mr. Langlie testified that he wanted to be sure that Mr. Soderstran wished to make a will, and that his desire to do so was clearly expressed. Mr. Langlie definitely understood Mr. Soderstran's testamentary wishes, made notes, and said that he would go to his office, have the will prepared, and return later, requesting Mrs. Howe to await his return. When the witness returned with the typed will, he read it to Mr. Soderstran in English, and requested Mrs. Howe to also go over the will with Mr. Soderstran, which she did. Mr. Soderstran then stated that he desired to execute the will. Two other ladies were present to act as witnesses with Mrs. Howe, Mr. Cornell having previously left the room, at Mr. Langlie's request. The will was then signed and witnessed in Mr. Langlie's presence, the testator stating, in the presence of the witnesses, that the document was his last will and testament, and requesting the ladies to affix their signatures to the will as witnesses, which they did. In the course of the examination of the witness, the following occurred:

"Q. You were speaking of this conversation. Aside from any conversation in Finnish, did you converse enough in English yourself with Mr. Soderstran to be sure in your own mind that he knew what he was saying to you and that he understood what you were saying to him? A. Yes, I felt that he was old and sickly, but that he knew what he was doing."

On cross-examination, the witness testified that Mr. Soderstran's relationship with his church was discussed, Mr. Langlie desiring to make sure that all possible objects of the testator's bounty had been considered by him. The witness again testified that he read the will in English to Mr. Soderstran, and that, to the best of his recollection, Mrs. Howe also read the will to Mr. Soderstran in English and translated some portions into Finnish. The witness also testified that the document was handed to and examined by Mr. Soderstran.

Mrs. Ellen Howe was called as a witness by appellant. Mrs. Howe was absent from Seattle during the trial, and the cause was continued some days to await her return. The witness was an old friend of Mr. Soderstran, having known him for many years. She was a Finn by birth and spoke Finnish. She testified that she had been well acquainted with Mr. Soderstran's two wives; that she knew Emil Koskinen, and knew that Mr. Soderstran had made a will in Mr. Koskinen's favor. Mr. Soderstran occasionally visited the witness in her home. She testified that, on some occasions, Mr. Soderstran had stated that he was not satisfied with the attention Mr. Koskinen was giving him. The witness further testified that Mr. Soderstran's room was in poor condition; that he was personally dirty; that she took him to her home, where she fed and cared for him, and that she had suggested that Mr. Soderstran make a will in favor of the Lutheran church, but that he replied: " 'No, I'm not going to give anything to the Lutheran Church, but I am going to make my will to the Congregational Church or Frank Cornell.' " This was early in December, 1947.

The witness testified that she visited Mr. Soderstran December 22nd; that she was there when Mr. Langlie first appeared and made notes concerning Mr. Soderstran's wishes to be expressed in his will. The witness testified that she never made any suggestion to Mr. Soderstran that he leave his property to appellant, and that she never heard anyone else make such a suggestion; that, when Mr. Langlie

returned with the written will, Mr. Soderstran read the will himself; that he read English quite well, and understood what he was reading. She further testified that Mr. Langlie first read the will to Mr. Soderstran in English; that, during the course of the conversation, she translated to Mr. Soderstran some English words that he did not understand into Finnish, and that Mr. Soderstran knew exactly what he wanted, the witness stating: "You bet. He wasn't crazy, that man." Mrs. Howe testified that she was nowise interested in the outcome of the litigation.

Upon cross-examination, the witness testified that, at some previous time, Mr. Soderstran had stated that he wished to leave one hundred dollars to his stepgrandson, and that, when the preparation of the will was being discussed with Mr. Langlie, she called that matter to Mr. Soderstran's attention. The witness testified that Mr. Soderstran understood English as well as she did; that he and she generally spoke English, rather than Finnish, and that she only spoke Finnish "when I have to." She also testified that she had never had any discussion with Mr. Soderstran concerning Mr. Cornell, and that she did not mention Mr. Cornell to Mr. Langlie. She testified that Mr. Soderstran had asked her to keep his bankbook, and that, on the day of the execution of the will, she took it with her to the apartment and turned it over to Mr. Cornell, because he was attending to the payment of Mr. Soderstran's bills. Mrs. Howe testified that she acted as a witness to the will, and testified to its execution by Mr. Soderstran.

Laura J. Steiner and Nellie Wylie were also subscribing witnesses to the will, and testified in support thereof.

Emil Koskinen testified as a witness on behalf of respondents, his testimony being directed largely to his relations with Mr. Soderstran, and the execution of the latter's will in favor of the witness. He also testified that Mr. Soderstran's mental condition was not good in December, 1947. Six other witnesses were called by respondents, testifying generally to Mr. Soderstran's physical and mental condition during and prior to December, 1947, and concerning his

relations with Mr. Koskinen and Mr. Cornell. Two witnesses testified regarding respondents' relationship to Mr. Soderstran, and the fact that he had other nephews and nieces in Finland.

Appellant Cornell testified as a witness on his own behalf. On objection to a question by appellant's attorney, the court ruled that Mr. Cornell could not testify concerning any conversations with Mr. Soderstran, and, consequently, the testimony of the witness was limited to what he had done in and around the apartment house. Mr. Cornell stated that he telephoned Mr. Langlie (with whom he was not acquainted), asking him to come to the apartment to prepare the will. He also admitted that he was present in the apartment and heard the will read, prior to the execution of the document; that he left the room, at Mr. Langlie's suggestion, and that, later, Mr. Langlie handed him the executed will, which the witness put in a safe deposit box.

On cross-examination, Mr. Cornell admitted that, prior to the trial, he had placed in Mr. Koskinen's mail box at the apartment a small, rough drawing, showing a figure, marked "Emil" (Mr. Koskinen's christian name), behind a barred window, attached to a slip of paper upon which was written: "Would *you* be surprised to see your little friend from Hackensack at the trial Sept. 30. Perjury and Bribery mean Walla Walla."

While this action by Cornell was blameworthy and ridiculous, it has no bearing whatever upon the issues to be here determined.

In their brief, respondents make the following statement:

"Under the law, the above facts and circumstances raise a presumption of undue influence and shift to the proponents of the will the burden of producing evidence to meet it. Furthermore, they affirmatively support the finding of undue influence and far outweigh anything appellant produced to refute the presumption."

The trial court, in its oral summation of the evidence, stated (referring to Mr. Soderstran): "He was stubborn and easily influenced and easily led to believe these stories about Koskinen."

The court further correctly stated the rule as follows:

"Generally speaking, influence exerted by means of advice, argument, persuasion, solicitations or entreaty is not undue influence, unless it is so importunate, persistent or coercive or otherwise so operates as to subdue and subordinate the will of the testator and take away his freedom of action."

The court also said:

"I am convinced from the record here which I have already reverted to, there was undue influence exerted— exercised upon the old man, not at the very moment, but it grew up gradually."

The record does not disclose any evidence whatever concerning the exercise of any direct influence brought to bear upon Mr. Soderstran to make the will in Mr. Cornell's favor. Respondents rely entirely upon their contention that the evidence raises a presumption of the undue influence, which, they contend, resulted in the making of the will of December 22, 1947. They argue that the evidence introduced by appellant, which, upon the issue before this court, was necessarily purely negative in its character, was insufficient to defeat the presumption upon which the trial court based its decision in favor of respondents. Respondents disregard the strong presumption in favor of a lawfully executed will.

In determining the question here presented, there are several matters which may properly be considered. Mr. Soderstran had no near relatives. While his nephew and nieces, respondents herein, lived in the eastern part of the United States, it does not appear that he had ever seen any of them or had any contact with them, other than the receipt of some Christmas cards and a letter or so. It does not appear that he had ever even considered making a will which would bequeath them any portion of his estate.

This is not one of those cases in which an aged testator made a will in favor of a stranger, revoking a prior will or wills in favor of persons who were natural objects of his bounty. The record does not disclose the beneficiaries of prior wills made by the testator, and the only other will that was mentioned in the evidence was that in favor of

Mr. Koskinen, who was as much a stranger to the testator as was Mr. Cornell. One will is no more "unnatural" than the other.

While Mr. Koskinen contends that he took the best of care of Mr. Soderstran, the evidence strongly suggests that the latter might well have had causes of dissatisfaction in connection with the relations of the two men. Mr. Koskinen admitted that he had paid no rent for the unit he was occupying for a considerable period of time, and that he had worked very little from October, 1945, until after Mr. Soderstran's illness. It also appears that Mr. Koskinen collected all the rents until, in the fall of 1947, Mr. Soderstran insisted upon collecting the rent from Messrs. Cornell and Meitmann. The business relationship, such as it was, between Mr. Soderstran and Mr. Koskinen was one which either party could terminate at any time.

■ It must always be remembered that, unless a will has been made as a matter of contract, the testator may make a new will at any time and for any reason or no reason, save a change of his testamentary wishes. Such wills are perfectly valid, provided the person making the will enjoyed testamentary capacity, and that the will was not made as the result of *undue* influence.

■ This court has several times considered questions concerning wills which, it was alleged, were executed pursuant to undue influence exercised upon the testator. We quote from some of these cases:

"To vitiate a will on the ground of undue influence, the evidence must show that the testator's volition at the time of the testamentary act was controlled by another, and that the will was not the result of a free exercise of judgment and choice. *Converse v. Mix,* 63 Wash. 318, 115 Pac. 305; *In re Patterson's Estate,* 68 Wash. 377, 123 Pac. 515. The evidence fails to show undue influence." *In re Roy's Estate,* 113 Wash. 277, 281, 193 Pac. 682.

"This court is committed to the view that to vitiate a will there must be more than influence. It must be undue influence at the time of the testamentary act which deprived the testator of free will agency and prevented the exercise

of judgment and choice. [Citing cases.]" *In re Larsen's Estate,* 191 Wash. 257, 262, 71 P. (2d) 47.

"To vitiate a will there must be something more than mere influence. There must have been an undue influence at the time of the testamentary act, which interfered with the free will of the testator and prevented the exercise of judgment and choice. [Citing cases.]

"The evidence to establish fraud or undue influence must be clear, cogent, and convincing. [Citing cases.]" *Dean v. Jordan,* 194 Wash. 661, 671, 79 P. (2d) 331.

"In order to vitiate a will, there must be something more than mere influence. There must have been undue influence *at the time of the testamentary act, which interfered with the free will of the testator and prevented the exercise of judgment and choice. Dean v. Jordan, supra,* and cases therein cited." *In re Schafer's Estate,* 8 Wn. (2d) 517, 520, 113 P. (2d) 41.

In the case of *In re Bottger's Estate,* 14 Wn. (2d) 676, 129 P. (2d) 518, this court reversed an order of the trial court setting aside a will and certain deeds executed by the testator, and remanded the proceedings, with instructions to dismiss the contest. In the course of the opinion, concerning the question of undue influence, we said (p. 699):

"It is the universal rule that a will procured by undue influence is invalid, but the courts have always recognized that a will cannot be overthrown upon this ground unless the influence complained of was, in fact, *undue* influence. Our decisions clearly hold that influence may be exerted upon a testator in the form of advice, persuasion, or even importunity, directed to the end of affecting the testamentary disposition of his property, without in any way invalidating the will induced by these means. [Citing cases.]"

After referring to and citing from authorities, the opinion continues (p. 701):

"The essence of all these various formulae is that in order to constitute ground for invalidating a will, the influence allegedly exerted over the testator must have been such as to override his will power and substitute the will of the person exercising the influence. In other words, the person accused of dominating the testator must have imposed his wishes upon the latter, not by persuasion directed to his

intellect or by appeal to sentiment, but by coercion of his mind by threats, force, or unbearable insistence, so that the testament, though in form that of the testator, is in fact that of another who has established ascendency over the mind of the former."

In the case of *In re Martinson's Estate*, 29 Wn. (2d) 912, 913, 190 P. (2d) 96, appears the following:

"The right of testamentary disposition of one's property as an incident of ownership, is by law made absolute. It is a valuable right, closely protected by statute and judicial opinion. If a will has been executed with all legal formalities requisite to the validity of the instrument, and has been admitted to probate, our statute, Rem. Rev. Stat., § 1387 [P.P.C. § 218-5], imposes upon those who contest its legal force, the burden of proving invalidity by evidence that is clear, cogent, and convincing. [Citing cases.]

"In order to have a will set aside on the grounds that its execution was produced by undue influence, it must be shown that the influence exerted was such as overcame the will of the testator. To put it in other words, the influence must have destroyed the free will of the testator so that the will spoke the intent and desire of the one exerting the influence, and not the intent and desire of the testator. [Citing cases.]

"Legal definitions of the term 'undue influence' cannot be given that will serve as a safe and reliable test for every case. Each case depends to a very large extent upon the facts presented to the court. However, not every influence exerted over a person can be denominated undue influence. Generally speaking, influence exerted by means of advice, arguments, persuasions, solicitations, suggestions, or entreaties, is not undue influence, unless it be so importunate, persistent, or coercive, or otherwise so operates as to subdue and subordinate the will of the testator and take away his freedom of action. [Citing cases.]"

In the case last cited, the will of Simon Martinson, bequeathing his property to a Mrs. Earnest, was contested by the testator's brothers and sisters. The trial court dismissed the contest, upholding the will, and the trial court's order was affirmed by this court. Apparently, the evidence introduced by the contestants concerning the influence exerted over the testator by the beneficiary under the will was very

strong, but this court agreed with the trial court that the will should be upheld. In the course of the opinion, we called attention to the fact that such a case, on appeal to this court, is considered *de novo*.

In the recent case of *In re Kessler's Estate, ante* p. 156, 211 P. (2d) 496, George D. Anderson, as guardian of the person and estate of Mary A. Kessler, the daughter of the testatrix, brought an action against Delia F. Whatmore, as executrix of the estate of Rosa Kessler, asking that Mrs. Kessler's will be declared void because of her mental incompetency at the time the will was made, and because of undue influence exerted upon the testatrix to make the will in favor of Delia F. Whatmore. The trial court entered a decree declaring the will void because of the mental incompetency of the testatrix, making no finding upon the question of whether or not the will was executed pursuant to undue influence. This court, while of the opinion that the evidence did not afford a sufficient basis for holding that, at the time of the execution of the will, the testatrix lacked testamentary capacity, held that, from the record, it appeared that the will was executed in favor of the executrix by reason of undue influence exerted to that end, and affirmed the order of the trial court.

In the case cited, it appeared that the aged testatrix had previously directed that her will be prepared, leaving her property in trust for the benefit of her insane daughter during the latter's lifetime. This will was never executed, but Mrs. Kessler did make a prior will naming appellant and another friend as sole beneficiaries thereunder. The opinion states that, on the day Mrs. Kessler's last will was executed,

". . . appellant sought to have it provide that she and another party would be the beneficiaries. When this failed, appellant took decedent to an attorney of her own choosing. She was named as sole beneficiary. At all times when a trust was suggested, appellant objected."

The opinion further states:

"It appears very clear to us that appellant set about to and did take advantage of the condition of the decedent, and that the will disregarding the daughter was the crea-

ture of appellant and the will decedent executed spoke only the intent and desire of appellant."

As stated in the opinion, this court was

" . . . convinced that the mind of the testatrix was subjected to the will of the appellant, that the influence to make the will went far beyond mere advice or suggestions and became the moving factor which caused the testatrix to disinherit her invalid daughter and name the appellant the sole beneficiary."

In the case cited, the record showed direct influence exerted upon the testatrix by the beneficiary named in the will which this court directed be set aside. As admitted by respondents in the case at bar, there is no such evidence contained in the record before us. It may also be noted that the testatrix disinherited her own afflicted daughter, the natural object of her bounty, whose welfare and protection would ordinarily have been the mother's chief interest. The case is not here in point.

Respondents rely upon several of our decisions in which it was stated that evidence, while not necessarily sufficient to void a will upon the ground of undue influence, may cast upon the party upholding the will the burden of overcoming the presumption of undue influence which might arise from the evidence introduced by a contestant.

In this connection, respondents argue that, frequently, undue influence may be established only by circumstantial evidence. This is often true; but it is equally true that in such cases it may well be difficult for one seeking to uphold a will to establish, by affirmative evidence, the negative proposition that no undue influence was exerted in the procurement of the will. It must also always be remembered that, as above stated, in order to justify a judicial holding that a will is void, as having been unduly influenced, the evidence of undue influence "must be clear, cogent, and convincing."

In the case at bar, the evidence does not support the trial court's ruling that Mr. Soderstran's will in favor of Mr. Cornell was procured by undue influence, and, for that reason, should be declared void.

The order appealed from is reversed, with instructions to the trial court to dismiss respondents' petition in contest of Mr. Soderstran's will, which the superior court had previously admitted to probate.

ALL CONCUR.