[No. 31312.    Department One.    February 21, 1950.]

*In the Matter of the Estate of* GEORGE KINSSIES, *Deceased.* GEORGE F. KINSSIES, JR., *Respondent,* v. ANNA KINSSIES, *Individually and as Executrix et al., Appellants.*[1]

*Don G. Abel,* for appellants.

*Lester T. Parker,* for respondent.

BEALS, J.—George Kinssies, Sr., and his late wife were for some years residents of Westport or a nearby town, Grays Harbor county. Mrs. Kinssies died during the month of November, 1939, at which time they had four living children, George Kinssies, Jr., Eric Kinssies, Werner Kinssies, and Anna Kinssies (now Mrs. Bunch).

The two elder sons, George, Jr., and Eric, married sisters during the year 1938, a year or so prior to the death of their mother.

Eric Kinssies died during the year 1945, leaving surviving him a daughter, Arline Kinssies, and his wife.

[1]Reported in 214 P. (2d) 693.

Shortly after his wife's death, Mr. Kinssies made his will, which was prepared by A. M. Abel, Esquire, his attorney. It appears that, by the terms of this will, the testator bequeathed his property to his daughter Anna and his youngest son Werner, in equal shares.

March 1, 1940, Mr. Kinssies married Anna Beers, who is now his widow, and, soon after his second marriage, destroyed the will above mentioned.

During the spring of 1947, Mr. Kinssies became ill, suffering from a serious heart condition, and, June 23rd, his physician, Dr. M. W. Brachvogel, sent him to the community hospital in the city of Aberdeen, in which city the doctor maintained his office.

Mr. Kinssies' daughter Anna testified that, a little before seven o'clock on the evening of June 27, 1947, she went to the hospital to see her father, and that, as a result of her conversation with him, she telephoned A. M. Abel, Esquire, from the hospital, stating that her father desired to see him. Mr. Abel went to the hospital, and Anna met him and took him to her father's room, where were then present Oskar Berndt and Katharina Berndt, his wife (Mrs. Berndt being the sister of the then Mrs. Kinssies, Sr.). Anna introduced Mr. Abel to the Berndts and left the room.

Mr. Abel then, at Mr. Kinssies' request and in accordance with his instructions, prepared a will, writing it in longhand. Mr. Abel read the will, as prepared, to Mr. Kinssies, who then signed the document in the presence of Mr. Abel and Mr. and Mrs. Berndt, declaring it to be his will and requesting that it be witnessed as such, whereupon Mr. and Mrs. Berndt and Mr. Abel signed the document as witnesses. The will reads as follows:

"June 27, 1947

"I, George Kinssi[e]s, of Westport Washington of mature age and sound mind and not acting under duress by any person hereby make my last will and testament:

"To my beloved wife, Anna I bequeath and devise the whole of my estate and name her executrix hereof.

"After her use of the same I wish it to go to my children Ann and Werner equally.

"I am not leaving anything to my son George as he is married and self supporting. Nor do I leave anything to my granddaughter Arline Kinssi[e]s.

"In Witness Whereof I sign my name in the presence of the undersigned as witnesses who sign at my request and in my presence and I hereby publish this as my last will.

"[Signed]  GEORGE KINSSIES

"The undersigned witnesses at the request of the testator in his presence and in the presence of each other subscribe our names hereto.

"[Signed] Mrs. Katharina Berndt
"[Signed] Kurt Oskar Berndt
"[Signed] A. M. Abel."

George Kinssies, Sr., died September 29, 1947, and, October 4, 1947, the document above referred to (having been filed in the office of the clerk of the superior court for Grays Harbor county), supported by the testimony of the three witnesses thereto, which was reduced to writing, was admitted to probate as the last will and testament of George Kinssies, deceased, and the appointment of Anna Kinssies, named in the will as executrix thereof, was confirmed.

April 5, 1948, George Kinssies, Jr., filed with the clerk of the superior court for Grays Harbor county his petition in contest of the will, praying that the order admitting the document to probate as the will of George Kinssies be revoked, and that the document itself be declared null and void. Petitioner also prayed for equitable relief.

A citation was regularly issued upon the petition, directed to Anna Kinssies, personally and as executrix, and to Werner Kinssies and Anna Bunch, as legatees.

The will contest was heard June 14, 1948, before the superior court. At the close of the hearing, the trial court took the matter under advisement, and, over sixteen months later, November 4, 1949, rendered its decision, embodied in a decree filed that date, revoking and annulling the will, terminating the power and authority of the executrix therein named and directing her to file her final account, and allowing the petitioner an attorney's fee and other relief. The record contains no oral summation or written memo-

randum opinion by the trial judge. The decree contains the following:

" . . . and it appearing to the Court that at the time of the execution of said will the said George Kinssies was not in a mental condition capable of making a legal will, due to illness and due to the administration of narcotic drugs, and was unduly influenced in the making of said will, . . ."

From this decree, Anna Kinssies as executrix and personally, Werner Kinssies, and Anna Kinssies Bunch have appealed.

Appellants make the following assignment of errors, which they argue together:

"(1) The Court erred in entering its decree that the will of George Kinssies be annulled and revoked.

"(2) The Court erred in entering its decree which states that at the time of the execution of said will George Kinssies was not in a mental condition capable of making a legal will due to illness and due to the administration of narcotic drugs, and was unduly influenced in the making of said will."

Respondent states that his contest of the will is based upon two grounds: (1) undue influence on the part of the wife, Anna Kinssies, and (2) the testator's lack of mental capacity to make a will at the time this document was drawn and signed.

At the outset, it may be noted that respondent refers to his sister Anna and his brother Werner as "beneficiaries" under their father's will, while appellants argue that Mr. Kinssies' widow, Anna, is the sole beneficiary under his will. It may be stated that, if their father had died intestate, his children Anna and Werner would have inherited directly from their father, instead of occupying at least a doubtful position under his will. Of course, the will which the trial court set aside is not before us for construction, and we express no opinion whatever concerning the effect to be given to any portion of that document.

Only one exhibit was introduced, the hospital record of the testator, George Kinssies, Sr., which was offered in evidence by respondent.

From the evidence, it appears that, during the year 1938 and prior to the death of the mother of the Kinssies children, George Kinssies, Jr., and Eric Kinssies, his brother, married sisters, and that some ill feeling arose between the two wives and their mother-in-law. Apparently, this antagonism continued between George, Sr.'s, second wife (appellant Anna Kinssies) and the wives of the two sons, in spite of efforts on the part of George, Sr., to reduce the friction.

During the summer of 1945, George, Sr. arranged for a meeting of himself and his wife, George, Jr. and his wife, his daughter Anna, and four or five friends, in an attempt to terminate the theretofore existing ill feeling between Mrs. Anna Kinssies (and others) and the wife of George, Jr. Concerning this meeting, respondent, George, Jr., testified as follows:

"Q. At that conference didn't your father tell you and your wife to go your way but stay away from him and his wife and his family? A. That is right. Q. He told you to go your way and stay away from him and his wife and family? A. From their home. Q. To stay away from their home? A. That is right. Q. And that was because of the harsh words he thought at least that your wife had said in regard to his present wife, isn't that right? A. Might have been. Q. Well, that is what you understood to be the case, didn't you? A. Uh-huh. Q. So that there was a strained, very strained relationship between your father and yourself and your wife, wasn't there? A. Yes. Q. He told you not to come to his home, didn't he? A. Yes. Q. And since that had occurred wouldn't you say that there was a very strained relationship between yourself and your father? A. Naturally, why not."

Later, respondent testified that, while subsequent to this meeting he never visited his father's home (save on one occasion, immediately after his brother Eric had been drowned) and his father never visited his home, they did see each other occasionally and always conversed in a friendly manner. Respondent also testified that, while he and his father had frequently fished together prior to 1941, after that year they did not do so. Respondent stated that, shortly before their father went to the hospital, his brother

Werner suggested that, because of respondent's trouble with their father, it would be inadvisable for respondent to see him.

In his brief, respondent argues that ". . . the evidence is clear that the son, George, was very friendly with his father." This statement is refuted by the son's testimony above quoted. From the evidence, it appears beyond question that there was ill feeling between George, Jr.'s, wife and his own mother, and, after the latter's death and George, Sr.'s, remarriage, this feeling persisted and was accentuated between the wife of George, Jr., and her new mother-in-law. George, Jr.'s, sister-in-law, his wife's sister, was also involved in the unpleasant situation. Considerable animosity also existed between the parents of the wives of the two brothers and appellant Anna Kinssies.

Respondent relies strongly upon the fact that appellant Anna Kinssies refused George, Jr., permission to see his father while the latter was in the hospital, also contending that she refused to allow the son to see his father while the latter was at his home in Westport, assigning as her reason that a visit with George, Jr., would unduly excite his father.

It appears that Dr. Brachvogel instructed Mrs. Kinssies to use her own judgment as to the persons who should visit her husband at the hospital. While in the hospital, Mr. Kinssies was seriously ill, and it is reasonable to suppose that he should not have seen many visitors, and certainly no one should have been permitted to see him whose presence would have caused him to become excited or agitated.

In view of the long-existing ill feeling between the wives of the Kinssies brothers and their parents, on the one hand, and George Kinssies, Sr., and his first and second wives, on the other, the relations between the father and son would at least have been somewhat strained. Indeed, it appears that the son had not visited his father at the latter's home for some years. It further appears that George's father maintained, as he thought with good reason, a dislike for his son's wife and her family. The evidence conclusively shows that such a situation existed. It nowhere appears

that Mr. Kinssies, Sr., ever sought his son's society or that they met other than casually in the town in which they both lived.

It should be noted, in connection with respondent's contention that the will which the trial court set aside was made as the result of undue influence exerted over his father by Mrs. Kinssies, that neither respondent nor his younger brother Eric was a beneficiary under the will which their father had made several years previously, and before his remarriage.

The record contains nothing which even suggests that the testator and his second wife did not live together in entire harmony. It appears that Mrs. Kinssies was a good nurse, and that she devoted her time and efforts to the care of her husband, both before and after he entered the hospital.

It nowhere appears, from the evidence, that Mrs. Kinssies knew that her husband was contemplating making his will on the evening that it was prepared and executed.

A. M. Abel, Esquire, who practiced law in Aberdeen, was called as an adverse witness by respondent, and testified that he had acted as George Kinssies, Sr.'s, attorney for eight years or more; that, in response to a telephoned request, he called at the hospital on the evening of June 27th to see Mr. Kinssies; that Mr. and Mrs. Berndt, with whom the witness was not acquainted, were present, and that Mrs. Bunch entered the room during the evening. The witness testified that no one had previously talked to him concerning the preparation of a will to be executed by Mr. Kinssies; that Mr. Kinssies was inhaling oxygen through a "mask" or tube which he would hold to his nose; that, at convenience, he would remove the tube and speak to the witness; that the witness was provided with a table or something upon which he could write, and that he wrote Mr. Kinssies' will at his dictation.

Respondent's counsel called the witness's attention to the fact that, in the clause of the will referring to Mr. Kinssies' son George, the name "George" was written above the line,

and asked the witness why the name had been added later. The witness answered: "I can't give you any explanation only that he was talking, I was writing. Probably I may have just not gotten it in there as he told me."

The witness testified that, after the will was written, he read it to Mr. Kinssies, whose mind was clear and who knew "just what he wanted to do"; that Mr. Kinssies spoke clearly and naturally; that all the persons in the room could have heard and understood him; and that, mentally, his condition was normal.

Testifying in support of the will, the witness deposed that, on the date the will bears, in the presence of the witness and of Mr. and Mrs. Berndt, the testator signed the document, published the same as, and, to the witnesses, declared it to be, his last will and testament, requesting the witnesses to sign the document as such, which they then did, in the presence of the testator and of each other.

Katharina Berndt and Oskar Berndt, her husband, were called as witnesses by respondent. Mrs. Berndt testified that she had spent most of the afternoon and evening of June 27th with Mr. Kinssies, while Mrs. Kinssies went home for a rest; that the nurse gave Mr. Kinssies a hypodermic injection during the afternoon; and that he occasionally breathed oxygen through an appliance which he held to his nose.

The witness described the visit of Mr. Abel, the dictation of the will by Mr. Kinssies, the writing and reading thereof by Mr. Abel, the execution of the will by the testator, and the signing thereof by the witnesses. Mrs. Berndt stated that Mr. Kinssies was mentally alert and, although weak, was in full possession of his mental faculties.

Mrs. Berndt's husband, Oskar Berndt, testified that he frequently visited Mr. Kinssies after work and did so on the day of the execution of the will; that he entered the hospital room with Mr. Abel; that he heard the conversation between Mr. Kinssies, who was sitting up in bed, and Mr. Abel; that Mr. Kinssies told Mr. Abel that he wanted "to make a will"; that Mr. Kinssies, whom the witness had

known for about twenty years, appeared normal and that his mind was clear, although physically he was weak; and that no one prompted Mr. Kinssies as to his instructions to Mr. Abel concerning the terms of the will.

Dr. E. B. Riley, a practicing physician of many years' experience, was called as a witness on behalf of respondent. The witness had never seen Mr. Kinssies. After testifying concerning the use of certain drugs which, according to the chart in evidence, had been administered to Mr. Kinssies, the witness testified as to the effect of the drugs upon a person in Mr. Kinssies' condition. The following question and answer are typical of much of the testimony of this witness:

"Q. Well, does it [referring to one of the drugs mentioned] have any effect on the mental capacity? A. Oh, it may or it may not."

After reading the testimony of the witness, the most that can be said is that some of the drugs administered to Mr. Kinssies, during the afternoon of June 27th, might have made him sleepy or depressed the action of his nervous system or could have slowed his mental reactions. The witness testified that narcotics or opiates are administered when necessary for the relief of pain and to induce sleep. Such drugs may or may not affect the patient's mental condition.

Respondent called his stepmother, Anna Kinssies, as an adverse witness, asking the witness whether or not she had refused to allow respondent to see his father while the latter was in the hospital. She answered that she had so refused, testifying that Mr. Kinssies had told her that he did not care to see his son, and that the witness believed that a visit by the son would unduly excite the invalid. Mrs. Kinssies also testified as a witness on her own behalf.

Dr. M. W. Brachvogel was called as a witness by appellants. The doctor testified that he had been a practicing physician in the state of Washington since 1915; that he had attended George Kinssies, Sr.; that the charts introduced in evidence contained the hospital record of Mr.

Kinssies from June 23, 1947, until early in August, and that the witness had also attended Mr. Kinssies for two or three months prior to the earliest date on the chart.

When asked concerning the condition of Mr. Kinssies June 27, 1947, as disclosed by the chart, the witness stated that the patient's temperature, pulse, and respiration were referred to; that there was no elevation of temperature June 27th; that "the pulse rate was irregular, as it had been, raised around 100, but irregular"; that the respiration rate was between twenty and thirty "which was about the way it was going most of the time"; and that Mr. Kinssies' condition, as indicated by the chart, had been persistent, "relatively the same thing." When asked, "Was there anything about that that would affect his mind or his mental faculties or his will power?" the witness answered, "I wouldn't think so."

The chart for June 27th was discussed at length. It indicated that

". . . at two forty-five in the afternoon he [Mr. Kinssies] was given pantapon, grain ⅓ for his rest. At six o'clock he was given papaverine again for the heart muscle, relaxation and rest, at seven o'clock petrolager for his bowels, pantapon for pain at seven-thirty, given coramine for stimulation."

The doctor stated that papaverine is a narcotic, comparable to morphine, but much less potent and producing a different effect. The witness testified at considerable length concerning the nature of the drugs administered to Mr. Kinssies on the day in question, and the purposes for which the drugs were used. During the examination of the witness, the following occurred:

"Q. And you would say between,—particularly fixing the hours prior to seven-thirty, that is between seven o'clock and seven-thirty would you assume from knowing his condition that he had all of his mental faculties? A. Between seven and seven-thirty, before the second dose of pantapon was given? Q. Yes. A. I think so."

On cross-examination, the witness testified that the drugs were administered in small quantities, not sufficient to pro-

duce severe effects upon the patient; that Mr. Kinssies suffered from a serious heart condition; that the drugs administered were for the purpose of relieving the patient from suffering, and that, as a result of the drugs, the patient "might be a little drowsy, not very much."

On redirect examination, Dr. Brachvogel testified that, from the chart record covering the evening of June 27th, "I think there would have been no impression upon his mind or mental faculties."

█ The record contains nothing which rises to the dignity of evidence indicating that the testator was induced to execute the will in question as the result of undue influence exerted by any person. Mr. Kinssies' will cannot be characterized as unnatural. Many persons will their property to their spouses, with scant regard to adult children who are capable of earning a good living. The fact that Mr. Kinssies, prior to his second marriage, had made his will, leaving nothing to his son George, is extremely significant.

Many decisions of this court pertinent to the questions here presented were discussed in the recent case of *In re Soderstran's Estate, ante* p. 448, 213 P. (2d) 949.

Respondent admits that the evidence available to him must be largely circumstantial. The evidence as to undue influence, if any, exerted upon Mr. Kinssies, falls far short of the quantum of such evidence necessary in order to support a decree setting aside a will which has been regularly admitted to probate. *In re Roy's Estate,* 113 Wash. 277, 193 Pac. 682; *In re Larsen's Estate,* 191 Wash. 257, 71 P. (2d) 47; *Dean v. Jordan,* 194 Wash. 661, 79 P. (2d) 331; *In re Schafer's Estate,* 8 Wn. (2d) 517, 113 P. (2d) 41; *In re Bottger's Estate,* 14 Wn. (2d) 676, 129 P. (2d) 518.

Mr. Kinssies' will was prepared by an able lawyer of many years' experience, who had represented the testator as his attorney for a number of years. Mr. Abel testified that Mr. Kinssies himself dictated the will, stating the disposition he wished to make of his property.

█ The right to make a will is a valuable right, and the deliberate exercise of that right, in due form of law, should

not be set aside, upon the ground that the will was executed as the result of undue influence or because the testator lacked testamentary capacity, unless the evidence showing the existence of one or both of the grounds stated strongly supports an order vacating the will.

In the recent case of *In re Martinson's Estate*, 29 Wn. (2d) 912, 190 P. (2d) 96, we said:

"The right of testamentary disposition of one's property as an incident of ownership, is by law made absolute. It is a valuable right, closely protected by statute and judicial opinion. If a will has been executed with all legal formalities requisite to the validity of the instrument, and has been admitted to probate, our statute, Rem. Rev. Stat., § 1387 [P. P. C. § 218-5], imposes upon those who contest its legal force, the burden of proving invalidity by evidence that is clear, cogent, and convincing. [Citing cases.]"

It often happens that, after receiving a physical injury or while sick, a person desires to make a will. If for such a sufferer a physician prescribes a sedative or some medicine to ease pain or reduce nervousness, the fact that such a drug has been administered is not, of itself, proof or even weighty evidence of testamentary incapacity.

It does not appear that Mr. Kinssies' mind had ever been affected to even the least degree. The fact that he was inhaling oxygen through an appliance which he would use at pleasure, indicates nothing concerning his mental condition. Neither does it appear that any medicines which had been given to him had affected his mentality.

The will which is before us followed the pattern of a prior will which the testator had executed several years previously.

The burden rests heavily upon respondent to show, by evidence which is clear and convincing, that for some reason the will against which the contest was instituted should be set aside. *Dean v. Jordan, supra.* The record contains no such evidence.

The decree revoking the order admitting George Kinssies' will to probate is reversed and vacated, and the cause re-

manded to the superior court, with instructions to dismiss respondent's petition in contest of Mr. Kinssies' will.

SIMPSON, C. J., SCHWELLENBACH, GRADY, and DONWORTH, JJ., concur.