247 P.3d 821 (2011)
In the Matter of the ESTATE OF Jacquelyn BUSSLER, Deceased.
No. 39804-4-II.
Court of Appeals of Washington, Division 2.
March 8, 2011.
*823 Suzan L. Clark, Attorney at Law, Vancouver, WA, for Appellant/Cross-Respondent.
William Leslie Miles, Miles & Miles PS, Vancouver, WA, Valerie A. Villacin, Catherine Wright Smith, Smith Goodfriend PS, Seattle, WA, for Respondent/Cross-Appellant.
VAN DEREN, J.
¶ 1 Kathleen Bussler appeals the trial court's determination that her mother, Jacquelyn Bussler, had testamentary capacity when she executed her March 14, 2009, will and that it was not the product of undue influence by Kathleen's sister, Karen Bussler,[1] the sole beneficiary under the 2009 will. Karen cross appeals, arguing that the trial court erred in awarding her attorney fees paid from Jacquelyn's estate rather than by Kathleen in her individual capacity under RCW 11.24.050. We hold that the trial court did not err in admitting the 2009 will to probate because Kathleen failed to prove by clear, cogent, and convincing evidence that (1) Jacqueline did not have testamentary capacity when she executed it or that (2) Karen exerted undue influence on her mother to persuade her to execute the 2009 will. We further hold that the trial court did not abuse its discretion in denying Karen's request to require Kathleen to pay Karen's attorney *824 fees under RCW 11.24.050; accordingly, we deny Karen's cross appeal. We also deny both parties' requests for attorney fees on appeal.

FACTS
¶ 2 Jacquelyn Bussler died on March 22, 2009, and was survived by four children: Karen Bussler,[2] Kathleen Bussler, James Robert Ryan III, and Michael John Ryan.[3] Only Karen inherited under Jacquelyn's 2009 will but both Karen and Kathleen had been designated to inherit under her 1997 will.
¶ 3 Jacquelyn suffered from chronic obstructive pulmonary disease (COPD) for eight years, and also had peripheral vascular disease and ischemic cardiomyopathy. In April 2008, Karen moved from Illinois to live with Jacquelyn at Jacquelyn's residence[4] in Vancouver, Washington, and to serve as her primary caregiver due to Jacquelyn's declining health. Kathleen lived in Hayden, Idaho, and had last visited her mother in Vancouver for five weeks at the end of 2008.
¶ 4 Gilbert Kaleweno prepared a will for Jacquelyn in 1995.[5] He also prepared her 1997 will, which Kathleen argues should be probated in place of the 2009 will. The 1997 will bequeathed Jacquelyn's estate equally to her daughters, Karen and Kathleen, disinherited her two sons, named her husband as the personal representative, and named Kathleen as the alternate personal representative. In February 2000, Kaleweno also prepared a codicil to the 1997 will that replaced Kathleen with Karen as the alternate personal representative and kept Jacquelyn's husband as the primary personal representative. In 2001, Jacquelyn named Karen the primary beneficiary and Kathleen the contingent beneficiary of a life insurance policy worth $2,200 at the time of her death.
¶ 5 In December 2003, Jacquelyn designated Karen as her attorney-in-fact through a durable power of attorney. The power of attorney became "effective upon the disability or incompetence of the Principal." Ex. 17 at 1. Karen testified that in the months before Jacquelyn's death, she signed documents for her mother using her power of attorney. On December 12, 2008, using the power of attorney, Karen signed a quitclaim deed transferring Jacquelyn's house, located at 8108 Northeast 101st Avenue, into her (Karen's) name to help her mother qualify for state assistance. The next month, on January 22, 2009, Karen transferred the home back into her mother's name. Karen also used the power of attorney to sign her mother's election for hospice services, a Medicare secondary payor screening form, and a physician's order for life sustaining treatment. RP at 79-80. Karen stated that she did not consider her mother mentally disabled or incompetent but, rather, physically disabled. Karen testified that her mother "was having so much trouble with shakiness" that it made her handwriting "[b]ad." Report of Proceedings (RP) at 103.
¶ 6 Karen stated that in 2009, her mother asked her to contact an attorney to execute a new will and that she contacted William Miles after she unsuccessfully tried to contact Kaleweno. On March 14, 2009, eight days before her death, Jacquelyn executed a will drafted by Miles that left her entire estate to Karen. Jacquelyn executed the 2009 will at her home in Vancouver with two neighbors, Michael and Barbara Meyer, as witnesses. Before Jacquelyn signed the will, Marlis Cameron, Miles's legal assistant, reviewed the contents of the will with Jacquelyn; Cameron also witnessed and notarized Jacquelyn's and the witnesses' signatures on the will.
¶ 7 At the same time she executed her 2009 will, Jacquelyn executed a warranty deed conveying to Karen the real property she owned at 8108 Northeast 101st Avenue, *825 valued at $170,000. In addition to the real property, Jacquelyn had two bank accounts; her account at First Independent Bank had a $977.51 balance on April 1, 2009, following her death.[6]
¶ 8 On March 31, Karen filed the 2009 will with the Clark County Superior Court but she did not file a petition requesting that it be admitted to probate. On April 2, Kaleweno provided Kathleen with Jacquelyn's 1997 will and the 2000 codicil. On April 10, Kathleen filed a petition requesting that the trial court probate the 1997 will, invalidate the 2009 will, and appoint her the personal representative of her mother's estate. Kathleen's petition asserted that the 2009 will was "invalid and was executed without competency, capacity and under undue influence." Clerk's Papers (CP) at 1-2. On April 21, Karen filed a petition asking the court to revoke the 1997 will, probate the 2009 will, appoint her as the personal representative of Jacquelyn's estate, and award her $750 in attorney fees.
¶ 9 The will contest went to trial. At trial, the following people testified: (1) Karen; (2) Kathleen; (3) Kaleweno; (4) Mary Christenson, Kathleen's partner; (5) Cameron, the legal assistant who had reviewed the 2009 will with Jacquelyn and notarized it; (6) Mark and Raeann McGahuey, Jacquelyn's renters; (7) Scott Davidson, Karen's significant other;[7] and (8) Barbara and Michael Meyer, the neighbors who had witnessed Jacquelyn execute the 2009 will.
¶ 10 Cameron testified that she had reviewed the will and the warranty deed with Jacquelyn for approximately an hour before Jacquelyn signed and executed them. Jacquelyn and Cameron were the only people present during the review. According to Cameron, Jacquelyn appeared ill, had a hard time moving without a cane, was in a wheelchair, and looked like she had lost most of her hair. Cameron also felt that Jacquelyn was alert, cognizant, and understood the documents she was reviewing and signing.
¶ 11 Barbara and Michael Meyer had lived across the street from Jacquelyn for 27 years. They both testified that Jacquelyn knew who they were, that she knew that they were at her residence to witness her will execution, that she thanked them for coming over to her house, and that she had to be shown where to sign the will. Michael also stated that Jacquelyn appeared "[s]haky" when signing the will. RP at 23.
¶ 12 Davidson testified that on March 15, 2009, the day after Jacquelyn executed her 2009 will, she fell while trying to get to the porch. Davidson stated that the hospice workers had instructed them that Jacquelyn was to make her own decisions about her care and about whether she should be taken to the hospital. Even though Jacquelyn seemed shaken and tired after the fall, she did not want Davidson to call anyone.
¶ 13 Christenson testified that she last spoke to Jacquelyn on the telephone in October 2008 and that Jacquelyn did not indicate that she was angry or upset with Kathleen. On March 11, 2009, Christenson received a text message from Karen's cell phone that stated Christenson and Kathleen were not welcome in Jacquelyn's home. According to Karen, she sent a text message to Kathleen before Jacquelyn's death attempting to get her to call their mother.
¶ 14 Kathleen described her relationship with her mother as "[l]oving, caring, [and] very close." RP at 114. She stated that she called her mother "[a]t least once a week [and w]hen she got sick it was all the time, every couple [of] days." RP at 114-15. Kathleen testified that she received a text message from Karen stating that "we weren't welcome there and that [she (Kathleen) ] wasn't allowed to speak to [her] mother." RP at 124. The last time Kathleen spoke to her mother was on February 8. Kathleen stated that she tried to call her mother after February 8 but was unable to reach her. Kathleen felt that her mother did not have any reason to be angry with her or not want *826 to talk with her. She disputed that she was estranged from her mother. Kathleen stated that Karen would not let her participate in Jacquelyn's funeral arrangements and tried to discourage her from seeing her mother's body at the mortuary.
¶ 15 The trial court also admitted Jacquelyn's medical records.[8] Hospital records from February 4 indicated that Jacquelyn (1) was "able to interact with the interviewer" and there was "no psychomotor agitation or retardation"; (2) "[a]ppears mildly dysphoric"; (3) had adequate "[c]ontinuity of thought"; (4) had "[m]ildly impaired" cognition and was "able to come up with the year, but not the month, telling [the doctor] that it [was] September" and "unable to come up with the name of the president or the prior presidents" but "[c]oncentration [wa]s intact"; and (5) that her "[m]emory [wa]s grossly impaired." Ex. 7. A March 2 medical record stated that Jacquelyn was alert. On March 9, an emergency room physician called Jacquelyn's doctor to arrange a "Hospice consult;" records indicated a concern that Jacquelyn had visited the emergency room three times in one week. Ex. 10 at 453. On March 10, the records stated that Jacquelyn was "alert, sha[ ]king, [and] pale." Ex. 10 at 450. A referral intake note summary for Hospice SouthWest Memorial on March 11 stated that Jacquelyn had severe COPD, that her daughter was her caregiver, and that she had another daughter who was disabled and lived away.
¶ 16 On March 12, two days before Jacquelyn executed her 2009 will, hospice workers interviewed her. The record from that interview stated that Jacquelyn was alert and oriented to person and place. Additionally, the record noted Karen's "commitment to provide her mother with end of life care at home." Ex. 10 at 542. The record also stated that "Jacquelyn is estranged from her daughter Kathy, and refuse[d] to talk to Kathy, who call[ed] the patient often," although the source of that information is not indicated in the hospice record. Ex. 10 at 545. In an entry from March 13, the hospice assessment stated that Jacquelyn was alert and oriented to person and place but also forgetful and fatigued.
¶ 17 The trial court rejected Kathleen's claims that Jacquelyn executed the 2009 will without testamentary capacity or that Karen exerted undue influence over her mother. It found that the 2009 will was valid. The trial court also found that Karen should be appointed as personal representative and awarded her $4,600 in attorney fees and costs to be paid from Jacquelyn's estate.
¶ 18 Kathleen appeals and assigns error to the trial court's following findings of fact:
5. After reviewing the exhibits presented to the court at trial, it found it was clear from on or about the 19th of March the decedent would not have much longer to live.
. . . .
8. Ms. Cameron, a long-time employee of Miles & Miles, sat with decedent and discussed the terms of the Will and the Warranty Deed with her, which were executed at the same time. Ms. Cameron reviewed the Will page-by-page with the decedent determining it to be as decedent requested.
9. The medical records that were filed with the court indicated in February that decedent's cognitive abilities were "mildly impaired". On the Cognistat test, it indicated decedent was incorrect on the month and unable to indicate the current and immediate past presidents. Hospice records would indicate that decedent was alert to time, place and person. The records also pointed out family discord and it could raise emotional issues.
10. Records indicated decedent was also estranged from her daughter, Kathleen Bussler a[t] various times. At other times it would seem Kathleen was alienated from her mother, they would then reconcile and then decedent bec[a]me alienated again from Kathleen. Prior to Christmas 2008 it *827 was observed decedent established a reasonable relationship when Kathleen visited from Hayden Lake, Idaho.
11. Using the Durable Power of Attorney Karen Bussler transferred the real property to herself without authority and after receiving information that the transfer would not be beneficial to her mother, transferred the property back to decedent. Karen and her significant other had been residing with decedent caring for her for a period of time and until her death. The demands of personal care increased after Christmas as decedent fell repeatedly, was not eating, needed constant care, needed assistance in walking and was wheelchair bound the last several weeks of her life.
12. That Jacquelyn Bussler in executing her Last Will and Testament as referenced above and based upon the testimony of witnesses and despite ill health, the court gave weight to the time that went into explanation of the second Will and that decedent did understand her testamentary act.
13. The court could not find the use of Durable Power of Attorney as evidence of decedent's lack of cognitive ability to manage her own affairs as grounds to set aside the Will decedent signed on March 14, 2009.
14. The Court finds the Will of decedent signed on March 14, 2009 is the valid and Last Will and Testament to be accepted for probate.
CP at 60-61.
¶ 19 Additionally, Kathleen assigns error to the trial court's conclusions of law 1 and 2:
1. The Last Will and Testament of Jacquelyn Bussler signed on March 14, 2009 shall be considered the last Will of decedent to be used for probate in this cause of action.
2. Kathleen Bussler is not the Personal Representative of the estate of Jacquelyn Bussler.
CP at 61. Karen cross appeals the award of attorney fees against Jacquelyn's estate, arguing that the fees should have been awarded against Kathleen in her individual capacity.

ANALYSIS

I. STANDARD OF REVIEW
¶ 20 We review challenges to the trial court's findings of fact for substantial supporting evidence. Wenatchee Sportsmen Ass'n v. Chelan Cnty., 141 Wash.2d 169, 176, 4 P.3d 123 (2000). Evidence is substantial if it is sufficient to persuade a rational, fairminded person of the factual finding. Wenatchee Sportsmen Ass'n, 141 Wash.2d at 176, 4 P.3d 123. If the standard is satisfied, we will not substitute our judgment for that of the trial court. See Croton Chem. Corp. v. Birkenwald, Inc., 50 Wash.2d 684, 685, 314 P.2d 622 (1957). We review the trial court's legal conclusions de novo. Wenatchee Sportsmen Ass'n, 141 Wash.2d at 176, 4 P.3d 123.
¶ 21 Additionally, "[c]redibility determinations are for the trier of fact and are not subject to review." State v. Thomas, 150 Wash.2d 821, 874, 83 P.3d 970 (2004) abrogated in part on other grounds by Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). "[W]here there is conflicting evidence, the court needs only to determine whether the evidence viewed most favorable to respondent supports the challenged finding." In re Estate of Lint, 135 Wash.2d 518, 532, 957 P.2d 755 (1998).

II. TESTAMENTARY CAPACITY
¶ 22 Kathleen argues that the trial court abused its discretion in finding that Jacquelyn had the requisite testamentary capacity when she executed her 2009 will.
[A] person is possessed of testamentary capacity if at the time he assumes to execute a will he has sufficient mind and memory to understand the transaction in which he is then engaged, to comprehend generally the nature and extent of the property which constitutes his estate and of which he is contemplating disposition, and to recollect the objects of his bounty.
In re Bottger's Estate, 14 Wash.2d 676, 685, 129 P.2d 518 (1942); see also In re Estate of *828 Kessler, 95 Wash.App. 358, 371, 977 P.2d 591 (1999). "`Where a will, rational on its face, is shown to have been executed in legal form, the law presumes testamentary capacity in the testator, and that the will speaks his wishes.'" In re Estate of Riley, 78 Wash.2d 623, 646, 479 P.2d 1 (1970) (quoting In re Schafer's Estate, 8 Wash.2d 517, 520, 113 P.2d 41 (1941)). "`In order to overcome a will, the evidence must be cogent and convincing.'" Riley, 78 Wash.2d at 646, 479 P.2d 1 (quoting Schafer, 8 Wash.2d at 520, 113 P.2d 41).
¶ 23 Kathleen challenges findings of fact 8, 12, and 14 and argues that her evidence was clear, cogent, and convincing that Jacquelyn did not have testamentary capacity when she executed the 2009 will. In support of her argument, Kathleen focuses solely on helpful testimony and ignores the remainder of the evidence.
¶ 24 Kathleen contends that Cameron's testimony does not substantially support the trial court's finding that Jacquelyn had testamentary capacity for the following reasons: (1) Cameron met Jacquelyn for the first time the day of the will execution, (2) Cameron had minimal conversation with Jacquelyn, (3) Cameron testified that Jacquelyn was in a wheelchair and appeared to have hair loss, (4) Cameron did not know if Jacquelyn was on medication, and (5) Cameron and Karen had to point to where Jacquelyn had to sign her will: Additionally, Kathleen argues that "[n]othing in Cameron's testimony seem[ed] to indicate she had anything more than `yes' or `no' answers to her questions, nor d[id] it appear that Cameron engaged in any conversation with Jacquelyn." Br. of Appellant at 9.
¶ 25 But Cameron also testified that (1) she reviewed the will and warranty deed with Jacquelyn for approximately an hour before Jacquelyn signed and executed the documents and (2) she felt that Jacquelyn was alert, cognizant, and understood the documents she was reviewing. Additionally, the signing witnesses stated that Jacquelyn knew why they were there and knew what she was signing.
¶ 26 Kathleen also argues that substantial evidence does not support finding of fact 13, that Kathleen failed to show lack of testamentary capacity, based on Karen's use of the durable power of attorney. Finding of fact number 13 states, "The court could not find the use of Durable Power of Attorney as evidence of decedent's lack of cognitive ability to manage her own affairs as grounds to set aside the Will decedent signed on March 14, 2009." CP at 61. Kathleen contends that, although Karen began using the power of attorney in December 2008, she denied that Jacquelyn was incompetent but "does not explain what physical disability prevented her mother from executing these documents." Br. of Appellant at 9.
¶ 27 Kathleen is correct that the trial court did not expressly rule on whether the triggering events, "disability or incompetence of the Principal," under the power of attorney existed when Karen signed for her mother for hospice services, Medicare screening forms, a physician's order for life sustaining services, or on the quit claim deed to attempt to qualify her mother for state services. Ex. 17 at 1. But none of the entities who relied on her signature under the power of attorney challenges the effectiveness of the documents. And Karen's testimony explained that she did not consider her "mother" mentally disabled nor incompetent but, rather, physically disabled, and that her mother "was having so much trouble with shakiness" that made it difficult for her to sign documents legibly. RP at 103. A rational, fair-minded person could conclude that Karen's use of the power of attorney was not evidence of Jacquelyn's mental incompetence but that it was the result of Jacquelyn's increasing physical disability, which did not affect her testamentary capacity.
¶ 28 Next, Kathleen argues that substantial evidence does not support the trial court's finding of fact 5 that, "[a]fter reviewing the exhibits presented to the court at trial, it found it was clear from on or about the 19th of March the decedent would not have much longer to live." CP at 60. Kathleen argues that various medical records show that Jacquelyn was "forgetful and lethargic," taking narcotics, fatigued, and had poor vision within a few days of signing her will. Br. of Appellant at 10. Kathleen appears *829 to argue that her mother's illness following the execution of her will demonstrates her lack of testamentary capacity at the time of the will execution.
¶ 29 But even evidence that Jacquelyn was taking prescribed medications at the time she signed her will does not indicate that she lacked testamentary capacity. Our Supreme Court stated that often "while sick, a person desires to make a will" and evidence that the person has been prescribed "a sedative or some medicine to ease pain or reduce nervousness. . . is not, of itself, proof or even weighty evidence of testamentary incapacity." In re Kinssies' Estate, 35 Wash.2d 723, 734, 214 P.2d 693 (1950).
¶ 30 Jacquelyn's medical records indicate that in the two days before she executed her 2009 will, she was alert and oriented to person and place. Jacquelyn's medical records indicate that she became weaker and her health declined after her fall on March 15, the day after she signed her will.
¶ 31 Kathleen also argues that Jacquelyn's 2009 will was a radical departure from her prior testamentary scheme and that this supports an inference that Jacquelyn lacked testamentary capacity. On the contrary, the evidence demonstrates a gradual but steady change in testamentary disposition favoring Karen over several years. Jacquelyn's 1997 will disinherited her two sons and left her estate to Karen and Kathleen in equal shares. Jacquelyn's 2000 codicil replaced Kathleen with Karen as the alternate personal representative of her estate. In 2001, Jacquelyn made Karen the primary beneficiary of her life insurance. And in 2003, Jacquelyn appointed Karen as her attorney-in-fact. The medical records also indicate that Jacquelyn and Kathleen were estranged and that Karen was Jacquelyn's primary caregiver. Thus, Jacquelyn's 2009 will does not appear to be a radical departure from her prior testamentary scheme but rather a reflection of her close relationship with Karen, and growing estrangement from Kathleen,[9] as she neared the end of her life.
¶ 32 The medical and hospice records, together with the testimony of those who witnessed the will and Cameron's testimony, show that Jacquelyn was generally mentally sound, knew what she was doing and that the 2009 will reflected how she wanted her estate distributed after her impending death. The totality of the evidence is sufficient to persuade a rational, fair-minded person that the trial court's factual findings were based on substantial evidence and that Kathleen failed to prove by clear, cogent, and convincing evidence that Jacquelyn did not have testamentary capacity on March 14 when she executed her 2009 will. Thus, we will not disturb the trial court's conclusion that Kathleen's evidence did not overcome the presumption of validity of the 2009 will. Riley, 78 Wash.2d at 646, 479 P.2d 1.

III. UNDUE INFLUENCE
¶ 33 Next, Kathleen argues that the trial court abused its discretion in refusing to find that she failed to prove by clear, cogent, and convincing evidence that the 2009 will was "the product of undue influence." Br. of Appellant at 11 (boldface and emphasis omitted). Kathleen bore the burden at trial of proving by clear, cogent, and convincing evidence that Jacquelyn's 2009 will was procured based on Karen's undue influence. Kessler, 95 Wash.App. at 378, 977 P.2d 591; Riley, 78 Wash.2d at 663, 479 P.2d 1. The trial court did not enter findings of fact and conclusions of law on the issue of undue influence. But a trial court need not enter findings of fact or conclusions of law to support a negative conclusion.[10]State v. Bastinelli, 81 Wash.2d 947, 949, 506 P.2d 854 (1973) (citing Miller v. Geranios, 54 Wash.2d 917, 338 P.2d 763 (1959)). "`In the absence of a finding on a factual issue we must indulge the presumption that the party with *830 the burden of proof failed to sustain their burden on this issue.'" In re Welfare of A.B., 168 Wash.2d 908, 927 n. 42, 232 P.3d 1104 (2010) (quoting State v. Armenta, 134 Wash.2d 1, 14, 948 P.2d 1280 (1997)). Despite the presumption, we examine whether Kathleen sustained her burden to show by clear, cogent, and convincing evidence that Jacqueline's 2009 will was the result of Karen's undue influence on Jacqueline.
¶ 34 The clear, cogent, and convincing burden of proof contains two components, the burden of production and the burden of persuasion. Colonial Imps., Inc. v. Carlton Nw., Inc., 121 Wash.2d 726, 734-35, 853 P.2d 913 (1993). To meet the burden of production, there must be substantial evidence, i.e., evidence sufficient to merit submitting the question to the trier of fact. Colonial Imps., 121 Wash.2d at 734-35, 853 P.2d 913. The burden of persuasion is met if the trier of fact is convinced that the fact in issue is "`highly probable.'" Endicott v. Saul, 142 Wash.App. 899, 909-10, 176 P.3d 560 (2008) (quoting Colonial Imps., 121 Wash.2d at 735, 853 P.2d 913). In determining whether the evidence meets the clear, cogent, and convincing standard of persuasion, the trial court must make credibility determinations and weigh and evaluate the evidence. Thomas, 150 Wash.2d at 874-75, 83 P.3d 970.
¶ 35 A will is the product of undue influence when a party interferes with the testator's free will, preventing the testator from exercising his own judgment and choice. In re Smith's Estate, 68 Wash.2d 145, 153, 411 P.2d 879 (1966) (citing Dean v. Jordan, 194 Wash. 661, 671-72, 79 P.2d 331 (1938)). Certain circumstances may raise a question about undue influence, including (1) a fiduciary or confidential relationship between the testator and the beneficiary, (2) active participation by the beneficiary in preparing or procuring the will, and (3) the beneficiary's receipt of an unusually or unnaturally large part of the estate. Smith, 68 Wash.2d at 153, 411 P.2d 879 (citing Dean, 194 Wash. at 671-72, 79 P.2d 331). Other considerations include "`the age or condition of health and mental vigor of the testator, the nature or degree of relationship between the testator and the beneficiary, the opportunity for exerting undue influence, and the naturalness or unnaturalness of the will.'" Reilly, 78 Wash.2d at 647, 479 P.2d 1 (quoting Schafer, 8 Wash.2d at 521, 113 P.2d 41).
¶ 36 The presence of these elements will not automatically invalidate a will; rather, they "appeal to the vigilance of the court and cause it to proceed with caution and carefully to scrutinize the evidence offered to establish the will." Dean, 194 Wash. at 672, 79 P.2d 331. The combination of facts may be so suspicious as to raise a question of undue influence and, "in the absence of rebuttal evidence, may even be sufficient to overthrow the will." Dean, 194 Wash. at 672, 79 P.2d 331. But "the existence of [a question] does not relieve the contestants of the duty to establish undue influence by clear, cogent, and convincing evidence" that the presumptively valid will should be disregarded. Reilly, 78 Wash.2d at 663, 479 P.2d 1.
¶ 37 Here, Kathleen met her burden of production, i.e., the facts raised a reasonable question about why Jacquelyn disinherited Kathleen, a daughter who had shared the estate equally with her sister under her mother's 1997 will, and who had amicably visited her mother for a month shortly before her death. This is especially true since Karen was in a caretaking role with her mother, she held a power of attorney for her mother, she participated in procuring the 2009 will, and she received her mother's entire estate, indicia that raise a question of undue influence. Smith, 68 Wash.2d at 153, 411 P.2d 879 (citing Jordan, 194 Wash. at 671-72, 79 P.2d 331).
¶ 38 Turning to Kathleen's burden of persuasion, she relies on the trial court's finding of fact 11 that Jacquelyn required Karen's increased care after December 25, 2008, when her health was declining, as evidence that Jacquelyn was "vulnerable and susceptible to the exertion of undue influence by Karen to change her will." Br. of Appellant at 14. Although, as Kathleen argues, Jacquelyn's reliance on Karen is evidence of the opportunity to exert undue influence, it does not prove by clear, cogent, and convincing evidence that Karen took advantage of the *831 opportunity to exert undue influence; furthermore, Jacquelyn's reliance on Karen could also have "le[ ]d to a feeling that [Karen wa]s more deserving having undertaken the 24 hour care" of her mother, which the trial court acknowledged. CP at 57.
¶ 39 Kathleen challenges findings of fact 9 and 10:
9. The medical records that were filed with the court indicated in February that decedent's cognitive abilities were "mildly impaired". On the Cognistat test, it indicated decedent was incorrect on the month and unable to indicate the current and immediate past presidents. Hospice records would indicate that decedent was alert to time, place and person. The records also pointed out family discord and it could raise emotional issues.
10. Records indicated decedent was also estranged from her daughter, Kathleen Bussler a[t] various times. At other times it would seem Kathleen was alienated from her mother, they would then reconcile and then decedent bec[a]me alienated again from Kathleen. Prior to Christmas 2008 it was observed decedent established a reasonable relationship when Kathleen visited from Hayden Lake, Idaho.
CP at 60.
¶ 40 To refute the findings relating to family discord and Jacquelyn's alienation from Kathleen, Kathleen focuses on her own testimony that she and her mother had a "close loving relationship." Br. of Appellant at 15. She also discusses the testimony provided from Jacquelyn's renters, who talked with Jacquelyn once a month when they paid the rent and who related that Jacquelyn did not indicate an estrangement from Kathleen.
¶ 41 Kathleen also relies on Lint as illustrative of factors that support a finding of undue influence. Kathleen argues that in Lint, the court considered "the near-constant presence of the person alleged to have unduly influenced the testator, the exclusion of friends and family, and the fact that the individual in question enlisted the assistance of a new attorney and fired the testator's prior estate-planning attorney." Br. of Appellant at 17. Kathleen asserts that "[a]ll of these factors are present in the case at bar." Br. of Appellant at 17. But Kathleen's argument is unpersuasive because she minimizes the evidence of extensive undue influence that Christian Lint exerted over the testatrix, which evidence was central to the Lint court's discussion.
¶ 42 Lint involved a challenge to the validity of the testatrix's will and the validity of her brief, nonlegal marriage to Christian. 135 Wash.2d at 530, 957 P.2d 755. An expert witness testified that the testatrix's "cognitive impairment was significant and that due to the effects of cancer, she was vulnerable to undue influence." Lint, 135 Wash.2d at 530, 957 P.2d 755. The trial court concluded that the testatrix's will was "procured by fraud and undue influence and that her marriage to Christian was void due to lack of solemnization, [the testatrix's] incompetence at the time of marriage, and `exceptional circumstances indicating fraud of the grossest kind.'" Lint, 135 Wash.2d at 530, 957 P.2d 755 (quoting Lint Clerk's Papers at 2330). There were also substantial questions about the testatrix's competence when she signed financial powers of attorney, which a notary refused to notarize. Lint, 135 Wash.2d at 525, 957 P.2d 755. The trial court found that Christian made "concerted efforts to isolate and estrange [the testatrix] from her family and friends and to control every facet of her life." Lint, 135 Wash.2d at 538, 957 P.2d 755. Our Supreme Court explained that "[t]he undue influence which operates to void a will must be something more than mere influence but, rather, influence `which, at the time of the testamentary act, controlled the volition of the testator, interfered with his free will, and prevented an exercise of his judgment and choice.'" Lint, 135 Wash.2d at 535, 957 P.2d 755 (quoting Bottger, 14 Wash.2d at 700, 129 P.2d 518). The evidence here does not rise to this level.
¶ 43 Here, in contrast, the only evidence that Karen isolated her mother from family came from Kathleen's and Christenson's testimony. But there is no evidence that Karen excluded friends, neighbors, medical workers *832 or hospice personnel from contacting Jacquelyn, no persuasive testimony that Jacquelyn was incompetent before she executed her will, and no allegation of fraud. These facts distinguish this case from Lint. Although Karen may have had the opportunity to exert influence over Jacquelyn, Kathleen has not met her burden of demonstrating that Karen actually exerted influence that "`controlled the volition of the testat[rix], interfered with h[er] free will, and prevented an exercise of h[er] judgment and choice.'" Lint, 135 Wash.2d at 535, 957 P.2d 755 (quoting Bottger, 14 Wash.2d at 700, 129 P.2d 518).
¶ 44 In this case, the trial court had the benefit of numerous witnesses, as well as medical records, to evaluate Jacquelyn's intent, her ability to make her own decisions, and the totality of the circumstances surrounding her execution of a will disinheriting all but one of her children. It is the trial court's job to weigh all the evidence and to determine credibility of the witnesses when there is disputed evidence. Thomas, 150 Wash.2d at 874-75, 83 P.3d 970. Because credibility determinations are for the trier of fact, they are not subject to our review. See Thomas, 150 Wash.2d at 874, 83 P.3d 970.
¶ 45 We hold that Kathleen failed to demonstrate by clear, cogent, and convincing evidence that her mother's new will was a result of Karen's undue influence. Relying on the trial court's failure to enter an express finding on undue influence, we hold that substantial evidence supports the trial court's presumptive finding that there was no undue influence, and, thus, its legal conclusion admitting the 2009 will to probate was not erroneous.

IV. ATTORNEY FEES
¶ 46 In her cross appeal Karen argues that the trial court erred in failing to award attorney fees to her from Kathleen, rather than from Jacquelyn's estate, under RCW 11.24.050. We will not interfere with a trial court's decision to award attorney fees under RCW 11.24.050 unless there are facts and circumstances that clearly show an abuse of the trial court's discretion. In re Estate of Larson, 103 Wash.2d 517, 521, 694 P.2d 1051 (1985). "Discretion is abused when it is exercised in a manner that is manifestly unreasonable, on untenable grounds, or for untenable reasons." In re Estate of Black, 116 Wash.App. 476, 489, 66 P.3d 670 (2003), affirmed on other grounds, 153 Wash.2d 152, 102 P.3d 796 (2004).
¶ 47 RCW 11.24.050, which addresses will contests, states:
If the probate be revoked or the will annulled, assessment of costs shall be in the discretion of the court. If the will be sustained, the court may assess the costs against the contestant, including, unless it appears that the contestant acted with probable cause and in good faith, such reasonable attorney's fees as the court may deem proper.
(Emphasis added.) Under this statute, if "a will is upheld in a contest, the court may assess fees against the contestant, if he or she did not act in good faith." In re Estate of Marks, 91 Wash.App. 325, 337, 957 P.2d 235 (1998) (emphasis added).
¶ 48 The operative word in awarding attorney fees under RCW 11.24.050 is "may." The statute does not require the trial court to assess attorney fees and costs against a losing will contestant. The statute simply allows the trial court to assess such fees, but only if the will contestant did not contest the will in good faith. This case does not fall within this statutory exception allowing the trial court to impose attorney fees against Kathleen because the trial court did not find that she acted in bad faith or that she lacked probable cause to contest her mother's will. Thus, we hold that the trial court did not abuse its discretion in failing to require Kathleen to pay Karen's attorney fees and costs below.
¶ 49 Both Kathleen and Karen request attorney fees on appeal. As Kathleen does not prevail, we deny her request. Even though Kathleen's will contest was unsuccessful, it does not appear that she filed her appeal without probable cause or acted in bad faith. Thus, we do not award Karen attorney fees and costs on appeal.
¶ 50 We affirm the trial court's decision to admit Jacquelyn's 2009 will to probate and deny Karen's cross appeal requesting that *833 Kathleen pay Karen's attorney fees and costs below. We also deny both parties requests for attorney fees on appeal.
We concur: HUNT, J., and WORSWICK, A.C.J.
NOTES
[1] We refer to parties sharing a common surname by their first names for clarity. We mean no disrespect.
[2] Karen has also used the last name Davison.
[3] Jacquelyn's sons are not parties to this action.
[4] Jacquelyn did not own or pay rent for the home she lived in. The only real property Jacquelyn owned was located at 8108 Northeast 101st Avenue, Vancouver, Washington. This is the property that she had rented to Mark and Raeann McGahuey for almost four years before her death.
[5] The codicil refers to Jacquelyn's 1995 will but Kaleweno testified that it was an error and the codicil actually amended her 1997 will. Jacquelyn's husband died in September 2000.
[6] Jacquelyn's other bank account's balance is not reflected in the record.
[7] Karen went by Scott's last name for a period of time but it appears that at the time of the will contest her legal name was Karen E. Bussler. Medical records from Jacquelyn's March 12 assessment for hospice care state that Scott Davidson was Karen Bussler's fiancé.
[8] The medical record dates contained in the trial transcript are inconsistent with the dates on the records themselves. We rely on the dates from the medical records.
[9] While Kathleen testified otherwise, there was also evidence of Jacquelyn's strained relationship with Kathleen. The trial court is in the best position to resolve the conflict in the testimony and to judge the credibility of the witnesses. Thomas, 150 Wash.2d at 874, 83 P.3d 970. We defer to the trial court's credibility determinations. Thomas, 150 Wash.2d at 874, 83 P.3d 970.
[10] Nevertheless, it would have been helpful for the parties and to us if the trial court had addressed Kathleen's claim of undue influence in its findings, or at least in its conclusions of law.