# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Estate of<br><br>MILDRED G. JOHNSON<br><br>Deceased.<br><br>STEVEN C. JOHNSON,<br><br>Appellant,<br>v.<br><br>GUARDIANSHIP SERVICES OF SEATTLE, substitute Personal Representative of the Estate of Mildred G. Johnson; HOPE SOLEY, Personal Representative of the Estate of July Cohn; CHRIS JOHNSON; and JOY D. WALTER,<br><br>Respondents. | No. 47124-8-II<br><br><br><br>UNPUBLISHED OPINION |

LEE, J. — Steven Johnson appeals a series of orders and judgments entered against him by the superior court for his actions as the personal representative of his mother's estate. Johnson argues that (1) this court should review the record de novo; (2) the Trust and Estate Dispute Resolution Act (TEDRA)[1] does not apply; (3) the appointment of a third party to review the case and enter written reports to the court was in error; (4) the superior court erred in finding Johnson breached his fiduciary duties; (5) the superior court erred in removing him as personal

---

[1] Ch. 11.96A RCW.

representative; and (6) the superior court erred in entering judgments against him and his wife individually and against their marital community.

We hold that (1) the superior court's findings of fact are reviewed for substantial evidence, and the removal of a personal representative and attorney fee judgments are reviewed for abuse of discretion; (2) TEDRA applies to this case; (3) the appointment of a third party to review the case was not in error, but the adoption of the third party's reports was; (4) substantial evidence supports that Johnson breached his fiduciary duties; (5) the superior court erred in removing Johnson as personal representative; and (6) the superior court erred in entering judgments against Johnson's wife individually, but did not err in entering judgments against the marital community. Thus, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

FACTS

Mildred Johnson (decedent) executed a will in January 1999, and a codicil to her will in May 2003; she passed away in November 2009. Her four children were the beneficiaries to her will: Joy Walter, Judy Cohn, Chris Johnson, and Steven Johnson. The codicil provided that Steven Johnson would serve as the personal representative with nonintervention powers.[2]

---

[2] In this opinion, the appellant, Steven Johnson, will be referred to as "Johnson." While Johnson is a beneficiary, this opinion will follow the superior court's lead and refer to Joy Walter, Judy Cohn, and Chris Johnson with the term "beneficiaries." Judy Cohn, one of the beneficiaries, passed away during the probate proceedings and her estate is represented on appeal by her personal representative, Hope Soley. For the purposes of this opinion, Judy Cohn and Judy Cohn's estate are one and the same.

Johnson filed a petition for probate on November 20, 2009. Johnson cited RCW 11.96A.040[3] and former RCW 11.96A.050(3)[4] in support of Pierce County having jurisdiction and being a proper venue. Johnson was appointed personal representative with nonintervention powers the same day and the probate was opened in Pierce County under RCW 11.96A.040 and former RCW 11.96A.050(3).

Johnson filed a notice to creditors on November 30, 2009, and published it the following day. Johnson prepared an inventory on June 3, 2011.

At the time of her death, decedent owned 10 percent of Live Love Laugh, LLC, (LLL)[5]; 42.5776 percent of Johnson Investment Company/Forest Park Estates, LLC (Forest Park).[6] Decedent also owned 6.53 percent of SevenJs Investment Limited Partnership (SevenJs).[7]

---

[3] RCW 11.96A.040 gives the superior court original jurisdiction in probate and trust matters.

[4] Former RCW 11.96A.050(3) addressed the venue for proceedings pertaining to the probate of wills and the administration and disposition of a decedent's property. LAWS OF 2001, ch. 203, §10.

[5] The sole asset of LLL was a 16-unit apartment complex in Seattle, Washington. Decedent was the only member of LLL, but she and Judy Cohn managed the affairs of the company. The remaining 90 percent of LLL was owned by the Live Laugh Love Irrevocable Trust, for which the decedent was trustee. Johnson became trustee on the decedent's death. Johnson made loans from the estate to LLL, but those loans were repaid, and there are no allegations of wrongdoing on Johnson's part and relating to LLL that are pertinent to this appeal.

[6] The sole asset of Forest Park was a 108-unit apartment complex in Everett, Washington. The John A. Johnson Trust, for which the decedent was trustee, owned 34.5314 percent of Forest Park. Johnson owned 20.4768 percent and Johnson's wife, Gail Johnson, owned 2.4142 percent of Forest Park. Johnson and his wife served as managers of Forest Park, as well as property managers of the apartment complex. As compensation for the property management services, Johnson and his wife received six percent of Forest Park's gross rental receipts.

[7] The sole asset of SevenJs was the Port Washington Marina in Bremerton, Washington. The decedent owned 6.53 percent of SevenJs, Judy Cohn owned 45.6 percent, and Johnson owned 47.87 percent. The decedent was the only general partner; Judy Cohn and Johnson were limited

On February 8, 2013, Johnson filed a motion for instructions in Pierce County Superior Court. The motion stated that Johnson wanted to sell Forest Park to himself and his wife for the company's fair market value and asked the court for instructions on the appropriate method of valuation for the company. The beneficiaries responded that Johnson was proposing an unreasonably low sale price. The superior court ordered the estate to obtain a current valuation of the estate's ownership interest in the company to establish the fair market value before Forest Park could be sold.

On December 27, the beneficiaries filed a motion for a complete accounting, seeking a proper distribution of the estate's assets, and requesting attorney fees under RCW 11.96A.150 and RCW 11.76.070. The beneficiaries alleged, among other things, self-dealing, conflicts of interest, and breach of fiduciary duty for Johnson's attempts to sell Forest Park to himself and for paying himself approximately $85,000 for dealings related to SevenJs.

On January 23, 2014, Johnson responded by denying the beneficiaries' allegations. On January 27, a court commissioner entered an order requiring Johnson to file a complete certified accounting of all of the estate's financial activities and liabilities for court approval and to distribute the estate's voting and non-voting interests in Forest Park to the beneficiaries and himself. The commissioner's order reserved the issue of attorney fees. Under the commissioner's order, Johnson filed an "Interim Report of Affairs of Estate and Accounting of Personal

---

partners. Johnson managed the SevenJs property and received six percent of the gross receipts as compensation for the property management services.

Representative" on March 13, 2014. Clerk's Papers (CP) at 787 (some capitalization omitted). Johnson moved for approval of his accounting and attorney fees for the estate on the same day.

On March 21, the beneficiaries moved to remove Johnson as the personal representative, to appoint a successive personal representative, and for an award of attorney fees. The beneficiaries alleged breach of fiduciary duty, conflict of interest, self-dealing, and waste. Johnson denied the allegations and opposed the motion. On April 4, the beneficiaries also filed a memorandum in opposition to Johnson's motion to approve accounting.

A hearing on Johnson's motion to approve his March 13 interim accounting and the beneficiaries' March 21 motion to remove Johnson was held on May 2. The superior court deferred ruling to allow the parties to submit recommendations for a third party accountant to review payments the estate had made while Johnson was personal representative relating to SevenJs. The superior court stated at the end of the hearing,

> I would not necessarily remove Mr. Johnson. In many ways, I think it has been more the way things have played out. I do think that he was wrong about this deal on [SevenJs], and I would like to have an independent person look at those issues.

Verbatim Report of Proceedings (VRP) (May 2, 2014) at 32. No written order was entered.

The beneficiaries recommended former King County Superior Court Commissioner Eric Watness.

> The Beneficiaries believe that an attorney with a background in probate and trust matters will best serve the Court in this matter. An accountant will not necessarily understand the complex legal issues at play in this probate, while an experienced attorney will both understand those issues and be able to complete an accounting and investigation of the propriety of Steven Johnson's use of Estate assets in this probate. Such investigation will allow a complete recommendation to be made to the Court regarding the amount to be reimbursed by Steven Johnson to the Estate.

CP at 1822. Johnson recommended a retired Pierce County Superior Court Judge.

A hearing was held on May 23. A written order was entered the same day (May 23 Order). The May 23 Order found that: (1) Johnson had a conflict of interest in attempting to purchase the estate's interest in Forest Park and in his continued operation of SevenJs; (2) the decedent was dissociated as general partner from SevenJs upon her death and SevenJs should then have dissolved and been wound up under RCW 25.10 *et seq.*; (3) Johnson did not have authority to incur obligations on behalf of SevenJs; (4) Johnson breached his fiduciary duty to the estate and the beneficiaries as a result of his conflicts of interest and self-dealing, but there was insufficient evidence to determine that the breach was a result of intentional misconduct; (5) the beneficiaries' attorney fees "in the amount of $48,511.15 through May 23, 2014," were incurred as a result of Johnson's breach of fiduciary duties, and, therefore, should be paid by Johnson. CP at 1936-38.

The May 23 Order also appointed Commissioner Eric Watness and provided the scope of his appointment.

> (1) "Whether Steven Johnson acted improperly in intentionally failing to give timely notice to creditors to Union Bank in relation to SevenJs shall be determined by the special master";
>
> (2) "Whether [t]he Promissory Notes payable to Steven Johnson in relation to SevenJs were authorized by SevenJs shall be investigated by the special master";
>
> (3) "The Estate was not [a] general partner [of SevenJs] at the time of Steven Johnson's alleged loans to SevenJs and the Estate did not guarantee any loans from Steven Johnson to SevenJs. Whether the Estate has an obligation to repay any alleged loans from Steven Johnson to SevenJs shall be investigated by the special master";
>
> (4) "Steven Johnson has a conflict of interest with the Estate in the payment of $85,096.69 from the Estate to himself in August, 2012. Whether and the amount

6

of such funds to be reimbursed by Steven Johnson to the Estate shall be determined by the special master";

(5) "Steven Johnson's actions as Personal Representative should be investigated by a Special Master, who will complete an Estate accounting, investigate Steven Johnson's actions as personal representative, and make recommendations to the Court regarding the amount of funds to be repaid to the Estate by Steven Johnson as a result of his breaches of fiduciary duties";

(6) "Com. Eric Watness of JAMS in Seattle, Washington is hereby appointed as Special Master in this proceeding for the purpose of investigating Steven Johnson's actions as personal representative of the Estate and his related management of [SevenJs, Forest Park, and LLL]. The Special Master shall prepare a complete Estate accounting to the Court, and shall report to the Court regarding the propriety of Steven Johnson' activities as personal representative, including but not limited to Steven Johnson's operation of SevenJs, an itemization and description of funds paid directly or indirectly in relation to SevenJs, an itemization and description of funds paid directly or indirectly to Steven Johnson personally, a discussion of whether attorney fees paid by the Estate were proper Estate expenses or were incurred for Steven Johnson's personal benefit only, and whether administrator fees charged by SevenJs are appropriate and reasonable. The Special Master shall further recommend the amount of funds to be repaid to the Estate by Steven Johnson related to his misuse or waste of Estate assets. Such Special Master Report shall be filed within ninety (90) days of the date of this Order, with a copy of such report provided to Steven Johnson's counsel and the Beneficiaries' counsel."

(7) "Approval of the Personal Representative's attorney fees and costs shall be reviewed by the special master with a recommendation as to [the] reasonableness and payment thereof."

CP at 1937-41.[8]

Johnson moved for reconsideration of the May 23 Order. In a footnote to the motion, Johnson stated he was not seeking reconsideration of the denial of his motion to approve the interim accounting, the revocation of his nonintervention powers, or the appointment of

---

[8] The parties signed a stipulated order stating Commissioner Watness was authorized to incur up to 50 hours' worth of fees at his normal rate, but he could apply to the court for more time if necessary.

"Commissioner Watness as special master." CP at 1944. The superior court denied the motion for reconsideration.

On August 29, Commissioner Watness filed an "Interim Report and Request for Instructions." CP at 2031 (some capitalization omitted). In his interim report, Commissioner Watness recommended the court grant him an additional 20 hours and authorization to retain a forensic accountant to review the books of Forest Park.

On September 17, Commissioner Watness filed a "Second Interim Report of Special Master." CP at 2039 (some capitalization omitted). Commissioner Watness described his investigation up to this point as follows:

> Following my appointment I met with counsel for the parties to outline the project and receive financial documents and pleadings. I have reviewed the legal pleadings in this matter as well as exhibits and declarations from the parties and their witnesses. I also conducted interviews of the principal parties to learn from them their respective points of view and to discuss the evidence they think is germane to my study. I conducted interviews of Richard Sanders, CPA for the estate as well as Mildred Johnson during her lifetime, and Lamont Loo who was the attorney for Ms. Johnson and now for the estate. The parties were given notice of these meetings with me and have had an opportunity to participate. Finally, I have reviewed legal documents that created and manage[d] the various entities that are assets of the estate as well as account statements, account ledgers and report[ed] tax records for each entity involved as well as Steven Johnson's personal redacted income tax forms.

CP at 2040. Under the section labeled "Conclusions from Special Master [I]nvestigation," Commissioner Watness made the following recommendations:

> (1) That Johnson and his wife, "as a marital community and individually, shall reimburse the Estate,"
>
> > (i) "$57,171.56 in unauthorized transfers Steven Johnson made from the operating account of the Estate of Mildred Johnson to the operating checking account for [SevenJs] and Labor and Industries after the partnership was liquidated";

(ii) "$85,096.60 for unauthorized withdrawals Steven Johnson paid from the Estate account directly to Steven and Gail Johnson in December, 2012";

(iii) "$4,000 in unsubstantiated expenditures from [SevenJs'] accounts";

(iv) "$2,925.00 as attorney fees paid out of the Estate of Mildred Johnson to Mark Roberts, attorney at law";

(v) "Prejudgment interest on the forgoing damages at 12% per annum from the date of disbursement";

(vi) Attorney fees incurred by the Beneficiaries accruing after May 23, 3014 [sic] not previously ordered should be paid by Steven Johnson personally in an amount to be determined based on proper documentation of fees and costs";

(vii) "$9,306.50 as attorney fees incurred by the firm of Davies Pearson allocated to this investigation and services that also benefitted Steven Johnson through the end of 2013. The court should reserve jurisdiction to determine fees and costs accruing thereafter";

(viii) "$21,337.23.00 [sic] as Special Master fees"; and

(ix) "Such other and further costs and fees for a forensic accountant and further costs for the services of a Special Master to the extent such services are ordered and incurred hereafter."

(2) That "the court make the following findings,"

(i) "The Management Agreements for [Forest Park], [SevenJs], and [LLL] retaining Steven or Steven and Gail Johnson and, in the case of [LLL], Hope Soley are affirmed including the term that provided manager compensation at the rate of 6% of gross receipts";

(ii) "Johnson, as Personal Representative . . . , purposely and upon advice of legal counsel for the estate delayed giving actual notice to Union Bank [of decedent's death]. The Bank was a known creditor under a Promissory Note and Deed of Trust as well as the personal Guarantee of Mildred Johnson for the mortgage against the Port Washington Marina owned by [SevenJs]. This strategy was based on the hope that Union Bank would not declare the Note in default on the death of Mildred Johnson, the sole General Partner, before the expiration of 24 months following her death.

Mr. Johnson [became] qualified as the Personal Representative on Mildred Johnson's probate estate and timely published notice to creditors but avoided giving actual notice to Union Bank. Such notice actually given would have commenced a four month Creditor Claim period. In fact, Union Bank did not give notice of Default until April 18, 2011 and filed a Creditor Claim on June 14, 2012 that was too late having exceeded the 24 month super-claim period for Creditor Claims";

(iii) "Johnson without legal authority transferred $57,000 in funds from the [Estate] to the operating account of [SevenJs] to pay the expenses of the Port Washington Marina";

(iv) "In December, 2012 Steven Johnson and Gail Johnson removed $85,096.60 from the estate . . . without legal authority but upon legal advice obtained from Mark Roberts, attorney at law, as reimbursement to themselves for claims they had for loans to the partnership, accrued but unpaid management fees and other contributions they personally made to [SevenJs]";

(v) "Johnson paid $2,925 for the legal services of Mark Roberts, Attorney at Law, using funds belonging to the Estate of Mildred Johnson theorizing that the legal services obtained were of benefit to the Estate but which actually only benefitted Steven and Gail Johnson";

(vi) "Johnson, as the Personal Representative, assumed management control of [SevenJs] without legal authority despite the lack of a properly designated general partner and failed to timely windup [SevenJs] according to the terms of the partnership agreement as amended";

(vii) "Promissory Notes created by Steven Johnson and payable to him by [SevenJs] were executed without authority of the probate estate and should be considered uncollectable against any assets other than those of [SevenJs]";

(viii) The "Estate was not the General Partner of [SevenJs] at the time of Steven Johnson's alleged loans to [SevenJs] and the Estate did not guarantee any loans from Steven Johnson to [SevenJs]. The Court previously found that Steven Johnson had a conflict of interest with the Estate in the payment of $85,096.60. The Estate has no obligation to repay any loans from Steven Johnson to [SevenJs]. To the extent that Steven Johnson collected funds from the Estate in the amount of $85,096.60, those funds shall be reimbursed to the probate estate";

(ix) "Johnson inadequately managed [SevenJs] as the Personal Representative of the estate by going well beyond his duty to accomplish the sale of [SevenJs] assets pursuant to Partnership agreements and wind up the partnership as required by Washington Partnership laws. The Partnership Agreement specified that the Partnership property be sold in full to one or both Limited Partners according to a specified process. That was the full extent of the authority granted to the Personal Representative. No additional authority was extended by the Will to the Personal Representative to operate the Partnership beyond liquidation. No action was taken by the remaining partners, Judy Cohn and Steven Johnson individually and the Estate, to grant to Steven Johnson power to continue operational control as PR or as the manager. Specifically, following the expiration of the time period set by the Partnership Agreement and well past even the 24 month Creditor claim period, Steven Johnson continued to manage Port Washington Marina, loan funds to the Partnership, make mortgage payments totaling over $70,000, collect revenues, pay ongoing expenses, incur a management fee and allowed his unpaid management fees to accumulate";

(x) "Johnson, as Personal Representative, should take immediate steps to secure $25,000 held in a Certificate of Deposit as an estate asset which was originally for the benefit of the Department of Natural Resources";

(xi) As personal representative, "Johnson transferred $12,000 improperly to the [LLL] as loans, those funds were returned to the estate account with no loss. An additional payment of $4,096.11 was properly made by the [Estate] to [LLL]. No damages should be assessed against Seven [sic] Johnson for transactions or management decisions of [LLL]"; and

(xv) "Johnson personally benefitted from services provided by Davies Pearson and should contribute toward those services. And he should pay for expenses and costs incurred to respond to the Beneficiaries' Motions for Accounting and to Remove Personal Representative. Any liability for additional attorney fees, costs forensic accounting and Special Master fees should be reserved."

CP at 2042-45.

On September 25, the beneficiaries moved the superior court to confirm and adopt the conclusions and recommendations in Commissioner Watness's second interim report, and to order distributions to the beneficiaries. Johnson argued that the report was still subject to change, the

11

conclusions and recommendations in the report were based on unsubstantiated facts, and the superior court lacked personal and subject matter jurisdiction to grant the beneficiaries' requests.

On October 3, the superior court heard arguments on the beneficiaries' motion to confirm and adopt Commissioner Watness's second interim report and order distributions to the beneficiaries. At the hearing, the superior court agreed to Commissioner Watness receiving more time and to the appointment of a forensic accountant. And the superior court held that Johnson "and the marital community of Steven and Gail Johnson" were required to pay the beneficiaries' attorney fees and costs through May 23, 2014, as was previously held in the May 23 Order, with interest at 12 percent per annum since May 23, 2014. CP at 2182-83.

At the October 3 hearing, Johnson also asked the superior court to clarify the extent of Commissioner Watness's appointment and authority. Johnson's attorney argued:

> First of all, it would help to have some clarification as to what Commissioner Watness' role and authority is. Is he a court-appointed expert under ER 706, which gives us the opportunity to examine and cross-examine him, not unlike a GAL in a domestic case who appears at a trial and is a witness in the case? Is he a discovery Special Master under Civil Rule 53.3? Is he a referee and, therefore, a trier of fact under RCW 4.48.020?
>
> All of those—all of those statutes and rules implicate different procedures by which the information or the presentation is preserved in an evidentiary proceeding. . .
>
> . . . .
>
> . . . We are not objecting to whatever time he does require. We recognize that he has a role. Again, I don't know under which authority he is proceeding in terms of ultimate reporting, examination to meet the due process entitlement of these proceedings and Mr. Johnson, again, examination, cross-examination, evidentiary proceedings and so forth. That's up to this Court to determine under which rule or statute he is acting to help guide us as we go forward to a final report.

VRP (Oct. 3, 2014) at 13, 19-20. The superior court "reserve[d] ruling on the special master[']s report pending reconsideration by the special master." CP at 2183.[9] Judgment was entered the same day in the amount of $48,511.15 against Johnson "and the marital community comprised of Steven C. Johnson and Gail Johnson, husband and wife" in favor of the beneficiaries. CP at 2185.

On October 16, Commissioner Watness filed a "Report of Special Master Correcting, Clarifying and Reconsidering Second Interim Report of Special Master." CP at 2188 (some capitalization omitted). In this report, Commissioner Watness stated that "[t]he Second Interim Report is simply a report with recommendations. Findings have not been entered and will not be entered until fully considered by the Trial Court." CP at 2190. Commissioner Watness revisited the issues relating to Forest Park, SevenJs, and attorney fees.[10]

On October 23, the beneficiaries again filed a motion to confirm and adopt Commissioner Watness's recommendations, direct partial distributions and enter judgment, and remove Johnson

---

[9] After the superior court had made its oral ruling, counsel again stated her objection for the record:

> [I]n the interest of making sure the record is complete, my understanding of TEDRA is that the Court has absolute discretion to award attorney's fees from any party to any party in a probate or trust proceeding.
>
> It is my understanding, on behalf of Mr. Johnson as personal representative of this estate, that the marital community and Ms. Johnson have not been made parties to this proceeding. Therefore, imposition or entry of a judgment against those nonparties, whether or not liability ultimately extends, is not proper; that the judgment and the order should recite that, while judgment is against him individually, that's all it should say.

VRP (Oct. 3, 2014) at 50.

[10] In this report, Commissioner Watness stated, "[u]ltimate responsibility for [attorney] fees should be based on principles set forth in RCW 11.96A.150 and existing case law." CP at 2191.

as personal representative. Johnson opposed the motion, again arguing that the beneficiaries' motion was improper because it relied "on the Special Master's *interim* recommendations—which are not based on facts established through formal evidentiary proceedings," and because the superior court lacked personal and subject matter jurisdiction to enter judgments against Johnson, Gail Johnson, or their marital community. CP at 2215.

On November 7, the superior court heard the beneficiaries' motion to confirm and adopt Commissioner Watness's recommendations, direct partial distributions and enter judgment, and remove Johnson as personal representative. The superior court stated that it could not discern, nor had Johnson identified, anything in Commissioner Watness's report that was disputed, which would be a reason for the superior court to not adopt Commissioner Watness's recommendations. The superior court continued:

> It wasn't my sense that I'm delegating my decision-making. What I did do, I think, is, to develop whatever the facts were. To the extent that they were contested, I would say that you are probably right to having a trial. To the extent that they are not contested, it seems to me that is more than a process that you get in a summary judgment proceeding, far more.

VRP (Nov. 7, 2014) at 18.

Johnson then responded, "In which case, then this gets noted for summary judgment, and we have a hearing on summary judgment." VRP (Nov. 7, 2014) at 18. Johnson continued:

> At some point in this process, procedure applies, whether it's 20 days and fact-finding of—on whatever basis, removal of Mr. Johnson at this juncture. 20 days. Noting a motion for summary judgment for the presentation of all facts that show the disputed facts, not just relying upon unsworn materials submitted by the special master. If a summary judgment were to fail, proceeding to an evidentiary proceeding on the merits.
>
> Mr. Johnson, too, is entitled to submit in full form his position. . . . The work of the special master was not to be the fact-finding proceeding. It was to be

14

the investigative proceeding for then submitting it—submitting all of the information at one point in time before this court so the court can do a comprehensive review.

VRP (Nov. 7, 2014) at 20-21. The superior court asked if Johnson could point to any fact that was disputed from Commissioner Watness's report and that this was Johnson's opportunity to identify what was disputed. Johnson again maintained that the current motion hearing was not the appropriate proceeding for identification of a disputed issue of fact and that such was appropriate after a motion for summary judgment was brought before the court.[11]

The superior court entered an order on November 7 adopting Commissioner Watness's recommendations and entering two judgments. The first judgment amended the previous attorney fee judgment of $48, 511.15 to include the fees and costs up through the date of the hearing, which brought the total amount to $90,438.95. The judgment debtor for the attorney fee judgment was "Steven C. Johnson and Steven Johnson's ½ interest in the marital community comprised of Steven C. Johnson and Gail Johnson, husband and wife." CP at 2230. The second judgment was for $179,836.89, which was for the unauthorized transfers Johnson made out of the estate. The judgment debtor for the unauthorized transfers judgment was "Steven C. Johnson individually, and the [sic] Steven Johnson's ½ interest in the marital community comprised of Steven C. Johnson and Gail Johnson, husband and wife." CP at 2234.

---

[11] Johnson also argued that the motion to remove him as personal representative was not properly before the court because the statute required 20 days' notice on a motion to remove a personal representative and the beneficiaries had made this motion less than 20 days prior. The beneficiaries countered that the motion for his removal had been made several times, including as far back as April 2014. This argument was not specifically addressed by the superior court in its ruling.

On reconsideration, the superior court ordered both judgments be entered "in favor of the Estate against Steven C. Johnson and Gail Johnson, and the marital community comprised of Steven C. Johnson and Gail Johnson, husband and wife, for the amounts specified" in each respective judgment. CP at 2306. However, the judgment for attorney fees was awarded against "Steven C. Johnson, and the marital community comprised of Steven C. Johnson and Gail Johnson, husband and wife." CP at 2309. And the judgment for unauthorized transfers was awarded against "Steven C. Johnson and Gail Johnson, individually, and the marital community comprised of Steven C. Johnson and Gail Johnson, husband and wife." CP at 2312.

Johnson appeals.

ANALYSIS

A. STANDARD OF REVIEW ON APPEAL

As an initial matter, Johnson argues this court should review the decisions of the superior court de novo. We review TEDRA's application to this proceeding de novo. *Sloans v. Berry*, 189 Wn. App. 368, 373, 358 P.3d 426 (2015). But we review the superior court's findings of fact for substantial evidence, and the superior court's decisions to remove Johnson as personal representative and enter judgments for attorney fees against him for abuse of discretion.

Johnson contends that where, as here, the superior court did not hear testimony and instead relied solely on a written record, the review on appeal is de novo. In support, Johnson relies on *In re Estate of Bowers*, 132 Wn. App. 334, 131 P.3d 916 (2006). In determining that de novo was the proper standard of review, the *Bowers* court noted that "[d]ecisions based on declarations, affidavits, and written documents are reviewed de novo," and further noted that, "[c]ourts have

16

also recognized that probate proceedings are equitable in nature and reviewed de novo on the entire record." *Id.* at 339.

The beneficiaries, on the other hand, rely on *Foster v. Gilliam*, 165 Wn. App. 33, 268 P.3d 945 (2011), *review denied*, 173 Wn.2d 1032 (2012), to support their position. In holding that the substantial evidence standard applied, the *Foster* court reasoned:

> Washington courts have applied a de novo standard in the context of a purely written record where the trial court made no determination of witness credibility. *Dolan v. King County,* 172 Wn.2d 299, 310, 258 P.3d 20 (2011). And in general, the standard of review is de novo in probate proceedings for decisions based on declarations, affidavits, and written documents. *In re Estate of Bowers,* 132 Wn. App. 334, 339–40, 131 P.3d 916 (2006). However, our Supreme Court has indicated that even with a purely written record, the substantial evidence standard is more appropriate in cases where the trial court reviewed an enormous amount of documentary evidence, weighed that evidence, resolved inevitable evidentiary conflicts and discrepancies, and issued written findings. *Dolan,* 172 Wn.2d at 310-11.

*Id.* at 54.

Here, both parties agree that the written record is significant and no oral testimony was taken. Commissioner Watness issued three reports, totaling 39 pages. The superior court also reviewed at least eight motions consisting of factual and legal analysis, along with the supporting declarations and exhibits—all of which totaled 644 pages—and held two oral arguments, before entering the May 23 Order appointing Commissioner Watness. The motions were accompanied by extensive declarations, affidavits, and supporting exhibits.[12] Thus, we hold that the substantial

---

[12] For example, on December 27, 2013, the beneficiaries filed a motion to direct Johnson to file a complete accounting, determine proper asset distribution, and award attorney fees that consisted of 23 pages of facts and legal authority. Attached to that motion were 411 pages of declarations and exhibits in support of the motion. Johnson filed an accounting on March 13, 2014, pursuant to the beneficiaries' motion, that totaled 492 pages with the supporting declarations and exhibits.

evidence standard is appropriate in this case because the superior court "reviewed an enormous amount of documentary evidence, weighed that evidence, resolved inevitable evidentiary conflicts and discrepancies, and issued written findings." *Foster*, 165 Wn. App. at 54.

In addition, we review the superior court's removal of Johnson as the personal representative and the entry of attorney fees judgments are reviewed for abuse of discretion.

> Under RCW 11.68.070, the trial court has discretion to remove a personal representative who has nonintervention powers if the personal representative fails to execute his or her trust faithfully or is subject to removal for any reason specified in RCW 11.28.250. *In re Estate of Beard,* 60 Wash.2d 127, 132, 372 P.2d 530 (1962); *In re Estates of Aaberg,* 25 Wn. App. 336, 339, 607 P.2d 1227 (1980). RCW 11.28.250 authorizes the court to revoke testamentary letters if it has reason to believe the personal representative wasted, embezzled or mismanaged estate property, or if the court finds for other reason such action is necessary. *Aaberg,* 25 Wn. App. at 339, 607 P.2d 1227. The trial court has broad discretion to remove an executor, but its grounds must be valid and supported by the record. *Id.* (citing *Beard*, 60 Wn.2d 127). If any one of the court's reasons for removal is valid, the court's decision will not be disturbed on appeal. *Id.*

*In re Estate of Ardell*, 96 Wn. App. 708, 718, 980 P.2d 771, *review denied*, 139 Wn.2d 1011 (1999). We follow the holding of *Ardell*, 96 Wn. App. at 718.

Also, because TEDRA applies, we review attorney fee awards in probate proceedings for abuse of discretion. RCW 11.96A.150; *In re Estate of Evans*, 181 Wn. App. 436, 450-52, 326 P.3d 755 (2014). RCW 11.96A.150 is part of the Trust and Estate Dispute Resolution Act, or TEDRA. Ch, 11.96A RCW.

B.     APPLICATION OF TEDRA

Johnson argues TEDRA was never invoked because no party initiated a TEDRA proceeding by filing a petition under TEDRA. We disagree.

18

TEDRA is codified in chapter 11.96A RCW. Effective July 28, 2013, RCW 11.96A.090 (2) requires that "[a] judicial proceeding under this title must be commenced as a new action." LAWS OF 2013, ch. 246, § 2. Before that, RCW 11.96A.090(2) stated, "[a] judicial proceeding under this title may be commenced as a new action or as an action incidental to an existing judicial proceeding relating to the same trust or estate or nonprobate asset." LAWS OF 1999, ch. 42, § 302. At all relevant times, RCW 11.96A.100(1) stated, "[a] judicial proceeding under RCW 11.96A.090 is to be commenced by filing a petition with the court." And "if the proceeding is commenced as an action incidental to an existing judicial proceeding relating to the same trust or estate or nonprobate asset, notice must be provided by summons only with respect to those parties who were not already parties to the existing judicial proceedings." RCW 11.96A.100(2).

Here, Johnson filed a petition for an order to probate the estate on November 20, 2009. The petition Johnson filed stated on the first page, "pursuant to RCW 11.96A.040 and RCW 11.96A.050(3), the petitioner elects to probate this estate in Pierce County, Washington." CP at 2. The superior court granted the petition, citing the same statutory authority. On February 8, 2013, Johnson filed a motion for instructions in superior court under the same cause number. On March 13, 2014, still under the same cause number, Johnson filed an interim report and accounting along with a motion to approve the interim report and accounting.

Pierce County Superior Court had jurisdiction over the probate under RCW 11.96A.040. And Pierce County Superior Court was a proper venue for the probate under RCW 11.96A.050. Thus, under both the current statute and former RCW 11.96A.090 (1999), a judicial proceeding under TEDRA was commenced as a new action when Johnson filed his petition for probate on November 20, 2009. The superior court regained jurisdiction over the probate at least by March

13, 2014, when Johnson moved for instructions on February 8, 2013, and moved for approval of his interim report and accounting on March 13, 2014. *Ardell*, 96 Wn. App. at 716. Therefore, Johnson's argument that TEDRA was never invoked fails.[13]

C.      PROPRIETY OF COMMISSIONER WATNESS'S APPOINTMENT AND THE VALIDITY OF THE
        PROCEEDINGS CONDUCTED

Johnson argues the superior court erred in appointing Commissioner Watness. We hold that the superior court did not err in appointing Commissioner Watness to fulfill the duties to which he was assigned. However, we hold that the superior court erred by adopting the facts, opinions, and conclusions contained in Commissioner Watness's reports.

TEDRA affords courts broad authority and discretion over probate and estate proceedings. TEDRA provides that, "the courts shall have full and ample power and authority . . . to administer and settle: (a) All matters concerning the states and assets of . . . deceased persons." RCW 11.96A.020(1).[14] Further, if TEDRA,

---

[13] Johnson also waived the argument that TEDRA does not apply based on his court filings and his counsel's representations during oral argument. First, Johnson argued in his March 13 motion to approve the accounting that RCW 11.96A.150 applied, and RCW 11.76.070 did not, in his argument to the court that it should not award attorney fees to the beneficiaries. Second, in his May 21 supplemental briefing, Johnson cited RCW 11.96A.150 as authority for his argument that the estate should pay the beneficiaries attorney fees. Third, in Johnson's May 30 motion for reconsideration, Johnson argued "In ruling on this motion for reconsideration under CR 59(a), *this court should be guided by the purpose of chapter 11.96A RCW.*" CP at 1949 (emphasis added); *see also* CP at 1987-93 (reply in support of motion to reconsider). Johnson made the identical assertion in his November 17 motion to reconsider. Fourth, at oral argument on October 3, Johnson cited TEDRA as a reason for not imposing attorney fees against Johnson. Finally, at the November 7 oral argument, Johnson argued that his removal as personal representative at that time was no appropriate under TEDRA and that the court had general jurisdiction of this matter under TEDRA.

[14] *See also* RCW 11.96A.060:

The court may make, issue, and cause to be filed or served, any and all manner and kinds of orders, judgments, citations, notices, summons, and other writs and

20

should in any case or under any circumstance be inapplicable, insufficient, or doubtful with reference to the administration and settlement of the matters listed in subsection (1) . . . , the court nevertheless has full power and authority to proceed with such administration and settlement in any manner and way that to the court seems right and proper.

RCW 11.96A.020(2). The "matters" referred to include:

any issue, question, or dispute involving:

. . .

(b) The direction of a personal representative . . . to do or abstain from doing any act in a fiduciary capacity;

(c) The determination of any question arising in the administration of an estate . . . that may include, without limitation, questions relating to: . . . (ii) a change of personal representative or . . . (iv) an accounting from a personal representative.

RCW 11.96A.030(2).

The present case fits the definition of a "matter" under TEDRA. RCW 11.96A.030(2). Accordingly, the superior court had "full and ample power and authority . . . to administer and settle" the present dispute involving Johnson's administration of the estate as its personal representative "in any manner and way that to the court seem[ed] right and proper." RCW 11.96A.020.

In exercising that power and authority, the superior court appointed Commissioner Watness to (1) *determine* whether "Johnson acted improperly in intentionally failing to give timely notice to creditors from Union Bank in relation to SevenJs"; (2) *investigate* whether the promissory notes payable to Johnson were authorized by SevenJs; (3) *investigate* whether the estate had an

---

processes that might be considered proper or necessary in the exercise of the jurisdiction or powers given or intended to be given by this title.

obligation to repay any loans from Johnson to SevenJs, given that the superior court had found that the estate was not a general partner at the time Johnson made the loans to SevenJs; (4) *determine* whether, and in what amount, Johnson needed to reimburse the estate for the August 2012 payment of $85,096.69, given that the superior court had found Johnson had a conflict of interest; (5) *investigate* Johnson's actions as personal representative, complete an accounting, and make recommendations regarding the amount that Johnson should repay the estate; and (6) file his report within 90 days. CP at 1937-38. All of these directions to Commissioner Watness were appropriate as they are within the broad purview that TEDRA affords courts to "administer and settle" matters concerning the estates and assets of deceased individuals. RCW 11.96A.020. These directions remained appropriate so long as the determinations Commissioner Watness made, and the results of his investigations, remained his own until such time as his investigations and determinations could be challenged or he was appropriately vested with the authority of a finder of fact.

Johnson argues that possible mechanisms for Commissioner Watness's determinations and investigations to be adopted by the superior court were ER 706, RCW 4.48.020, or CR 53.3, but that none of those mechanisms were ever cited by the superior court as its authority nor were the safeguards of those mechanisms satisfied. A case cited by both parties, *In re the Estate of Cooper*, 81 Wn. App. 79, 913 P.2d 393, *review denied*, 130 Wn.2d 1011 (1996), considers the same issue under analogous circumstances.

In *Cooper*, a daughter petitioned the superior court to remove her father as personal representative and trustee of her mother's estate, as well as for an accounting and attorney fees. 81 Wn. App. at 84. The superior court appointed a "'special master/referee to assist [it] in

resolving various disputes that [had] arisen in connection with [the Cooper] estate.'" *Id.* at 85 (alterations in original). The superior court's instructions to the special master/referee included "to 'review what has transpired in connection with the assets' deposited by Mr. Cooper in 1987 to fund the trust." *Id.* "After consulting with the [special master/referee], the [superior] court found that 'the accounting as accomplished to date [by the father] is not in accordance with generally recognized format and principals.'" *Id.* A revised inventory accounting was filed, and the special master/referee "concluded the amended accounting revealed 'no improprieties.'" *Id.* The daughter moved the superior court to discover the basis for the special master/referee's opinions. *Id.* In denying the daughter's motion, the superior court stated that the appointment of the special master/referee was "'solely for the purpose of deciding whether or not [the father] should be removed as Personal Representative.'" *Id.* The daughter challenged the use of the special master/referee, arguing that his report was used as evidence, and the court therefore should have given her the opportunity to challenge him or his report. *Id.* at 95.

Division Three of this court held that the superior court's use of the special master/referee's reports and its denial of discovery was error. *Id.* at 96. First, the court noted that ER 706 allows a superior court to appoint an expert with the parties' consent, but that the parties also have the right to depose the expert or examine him at trial, which did not happen. *Id.* Second, the court noted that RCW 4.48.010 provides that parties may consent to the superior court's referral of issues to a referee, but that the requisite procedures under that statute were not complied with. *Id.* Third, the court noted that Federal Rules of Civil Procedure 53, though not adopted in Washington at that

time, [15] was not complied with because the superior court did not provide an opportunity for the parties to submit written objections. *Id.*[16]

Despite the error, Division Three held there was no prejudice. *Id.* at 97. The court so held because (a) the only part of the special master/referee's opinion that the superior court relied on was the revised accounting that followed general accounting principles, (b) the revised accounting was subject to discovery, (c) the revised accounting was subject to cross-examination, and (d) the superior court rejected the special master/referee's ultimate conclusion on the trustee's management. *Id.*

Here, the same errors abound, but prejudice ensued. It is unclear under what authority the trial court appointed Commissioner Watness. If Commissioner Watness's authority came under ER 706, RCW 4.48.010 *et seq.*, or CR 53.3, then the procedures of those rules and statutes were not followed. If Commissioner Watness was not appointed under those rules or statutes, then the superior court improperly delegated its authority.

1.    ER 706

Commissioner Watness's ultimate role in the proceeding exceeded the scope and procedural safeguards of ER 706. This rule allows the superior court to appoint an expert on its

---

[15] CR 53.3 had not been adopted in Washington at the time *Cooper* was decided.

[16] The court also noted that CR 26(b)(5)(A) required the parties to be allowed to discover the special master/referee's opinions and the reasons for them because the special master/referee had to be considered a witness. *Cooper*, 81 Wn. App. at 96. This analysis is inapplicable to the present case because CR 26(b)(5)(A) contemplates the trial preparation discovery of experts' opinions, and here, there was no trial and no discovery period.

own motion.[17] A trial court's appointment and consideration of additional evidence under ER 706 is reviewed for abuse of discretion. *In re Welfare of Angelo H.*, 124 Wn. App. 578, 588, 102 P.3d 822, (2004), *review denied*, 154 Wn.2d 1028 (2005). The expert may "testify and . . . advise the court on technical matters when the facts presented are not clear to the fact finder." *Id.*

Here, the parties agreed to the court's suggestion of appointing a "special master," and each party submitted its recommendations. CP at 1820, 1831. The superior court selected Commissioner Watness. Commissioner Watness was informed of his duties in writing with the May 23 Order and that order was filed with the clerk. Commissioner Watness advised the superior court and the parties of his findings in three separate reports.

However, the superior court did not provide Johnson the opportunity to depose Commissioner Watness, nor did it provide a proceeding in which Commissioner Watness could be subject to cross-examination. ER 706 allows any party to depose the expert and requires the witness to be subject to cross-examination by each party. Therefore, if Commissioner Watness's

---

[17] ER 706 states:

> The court may on its own motion or on the motion of any party enter an order to show cause why expert witnesses should not be appointed, and may request the parties to submit nominations. The court may appoint any expert witnesses agreed upon by the parties, and may appoint witnesses of its own selection. An expert witness shall not be appointed by the court unless the witness consents to act. A witness so appointed shall be informed of the witness' duties by the court in writing, a copy of which shall be filed with the clerk, or at a conference in which the parties shall have opportunity to participate. A witness so appointed shall advise the parties of the witness' findings, if any; the witness' deposition may be taken by any party; and the witness may be called to testify by the court or any party. The witness shall be subject to cross examination by each party, including a party calling the witness.

authority came under ER 706, the superior court erred by not following the requirements of the rule.[18]

  2.  RCW 4.48.010 *et seq.*

Commissioner Watness's ultimate role in the proceeding did not conform to the statutory safeguards of RCW 4.48.010 *et seq.* RCW 4.48 provides for a trial before a referee. Referees may be appointed by consent of the parties under RCW 4.48.010, or without the parties' consent under RCW 4.48.020. Where a trial before a referee is employed, the proceedings "shall be conducted in the same manner as a trial by the court," except where otherwise indicated in the order of reference. RCW 4.48.060(1). Accordingly, "the referee shall apply the rules of pleading, practice procedure, and evidence used in the superior courts," unless those rules are waived. RCW 4.48.060(1).

Here, the parties consented to the appointment of a "special master," but did not agree on appointing Commissioner Watness, did not agree to a trial by referee, and neither party applied for trial by referee. CP at 1820, 1831. There is no record of the proceedings before Commissioner Watness to ensure that the proceedings were "conducted in the same manner as a trial by the court," and the language used by Commissioner Watness in his reports, such as saying he "conducted interviews of the principal parties to learn from them their respective points of view," demonstrates

---

[18] The beneficiaries argue that there was no "occasion for cross-examination" because "no live testimony was required under RCW 11.96A.100(7)." Br. of Resp't at 50. This argument fails for at least two reasons. First, RCW 11.96A.100(7) provides that "[t]estimony of witnesses may be by affidavit." Here, Commissioner Watness's reports were not affidavits. Second, RCW 11.96A.100 begins by stating, "Unless rules of the court require or this title provides otherwise." Here, ER 706 clearly requires Commissioner Watness to have been subject to cross-examination if his appointment was as a court-appointed witness.

that the formalities of trial were not followed. RCW 4.48.060(1); CP at 2040. Further, there was no order of reference to exempt the requisite formalities of the proceedings. RCW 4.48.060(1).

Despite the absence of the procedural protections, Commissioner Watness considered evidence, in the form of interviews and documents, and made findings and reached conclusions based on that evidence. The superior court then entered its own order and judgment based on Commissioner Watness's reports, in several places copying the findings and conclusions verbatim. By doing so, the superior court failed to conform to the statutory requirements.[19] Therefore, if Commissioner Watness's authority came under RCW 4.48.010 *et seq.*, the proceedings conducted did not provide the required statutory safeguards, and the superior court erred in not adhering to the statutory requirements.[20]

3. CR 53.3

Commissioner Watness's ultimate role exceeded the scope provided for in CR 53.3. This rule allows the court to "appoint a special master either to preside at depositions or to adjudicate discovery disputes, or both." CR 53.3(a). Here, however, there were no depositions to take and there were no discovery disputes. Apart from calling Commissioner Watness a "special master," none of his actions in that role aligned with the role of a special master as provided for by CR 53.3. Therefore, if Commissioner Watness's authority came under CR 53.3, his ultimate role in this case exceeded the scope allowed for under the court rules, and the superior court accordingly erred.

---

[19] Also, by doing so, appellate review was inhibited because no record was made.

[20] The beneficiaries state that they do not address the "'referee' issue because that statute is plainly inapposite," but fail to state why the statute is inapposite. Br. of Resp't at 49 n. 23. If they are claiming it is inapposite because the statutory procedures were not complied with, then they are correct.

4.      Prejudice

The beneficiaries argue that Johnson waived any claim of error as to the superior court adopting Commissioner Watness's reports when he did not object to Commissioner Watness's appointment or the objectives of the investigation. This argument fails because Commissioner Watness's *appointment* was not improper. What was improper was the superior court's adoption of the reports, and Johnson entered an objection when the motion to adopt the report was made. Therefore, Johnson preserved the error.

The error here is not without prejudice. Unlike the situation in *Cooper*, Commissioner Watness's findings and conclusions made up the majority of the court's order. In *Cooper*, the only opinion that the special master/referee gave that was relied on by the trial court was that the revised accounting followed general accounting principles. 81 Wn. App. at 97. But here, multiple findings and judgments made by the superior court were adopted directly from Commissioner Watness's reports.

Also in *Cooper*, the revised accounting was subject to discovery before trial, and the revised accounting was subject to cross-examination. 81 Wn. App. at 97. But here, there was no trial and there was no opportunity to cross-examine Commissioner Watness on his reports.

Finally, in *Cooper*, the trial court rejected the special master/referee's ultimate conclusion on the trustee's management. 81 Wn. App. at 97. But here, the trial court adopted the majority of Commissioner Watness's recommendations and conclusions.

Therefore, none of the reasons that the *Cooper* court identified in concluding that no prejudiced ensued exist here. Johnson was not provided any opportunity to challenge, or even respond to, Commissioner Watness's findings, conclusions or recommendations adopted by the

superior court. Accordingly, we hold that the superior court erred in adopting Commissioner Watness's reports and that prejudice resulted from that error.

D.    MAY 23 ORDER FINDING BREACH OF FIDUCIARY DUTY

Johnson argues that the superior court erred in finding that Johnson breached his fiduciary duties to the estate and its beneficiaries in the May 23 Order. Specifically, Johnson argues that the superior court's finding that he breached his fiduciary duties is inconsistent the superior court's finding that a special master was necessary to investigate whether Johnson's conduct was improper. We hold that substantial evidence supports the superior court's finding in the May 23 Order that Johnson breached his fiduciary duties to the estate and its beneficiaries.

We review Johnson's challenges to the findings of fact in the May 23 Order for substantial evidence. *See* Section A, *supra.* "Evidence is substantial if it is sufficient to persuade a rational, fair-minded person of the factual finding." *In re Estate of Bussler*, 160 Wn. App. 449, 460, 247 P.3d 821 (2011). "'[T]he court needs only to determine whether the evidence viewed [in the light] most favorable to respondent supports the challenged finding.'" *Id.* at 461 (quoting *In re Estate of Lint,* 135 Wn.2d 518, 532, 957 P.2d 755 (1998)). "[U]nchallenged findings of fact are verities on appeal." *In re Estate of Jones*, 152 Wn.2d 1, 8, 93 P.3d 147 (2004).

A "personal representative stands in a fiduciary relationship to those beneficially interested in the estate. He is obligated to exercise the utmost good faith and diligence in administering the estate in the best interests of the heirs." *In re Estate of Larson*, 103 Wn.2d 517, 521, 694 P.2d 1051 (1985). Personal representatives "must refrain from self-dealing, administer the estate solely in the interest of the beneficiaries, and uphold their duty of loyalty to the beneficiaries." *Jones*, 152 Wn.2d at 21.

Johnson does not challenge the superior court's findings that he owned 47.87 percent of SevenJs as a limited partner; that the other owners of SevenJs were the decedent, as the general partner, and one of the beneficiaries, as a limited partner; that the decedent was dissociated as general partner of SevenJs on the date of her death; that SevenJs should have been wound up following the decedent's death in November 2009 under the Limited Partnership Agreement and RCW 25.10 *et seq.*; and that the superior court "ha[d] insufficient evidence at this time to find that Steven Johnson's breaches of fiduciary duties as described [in challenged findings] were the result of intentional misconduct." CP at 1936-38.

In his January 2014 and April 2014 declarations, Johnson admitted that after the decedent died, he used his personal funds to pay some of SevenJs loan payments in an effort to prevent it from defaulting. In the same declarations, Johnson admitted he issued himself a check from the estate in the amount of $85,096. He said the $85,096 was calculated as the repayment of the $61,000 loan he had made with his personal funds and partial payment for the management fees he had not been receiving. Johnson also admitted to using the estate's funds to make payments to SevenJs while trying to keep the marina out of default, and that estate continued to make payments on SevenJs loan through May 2012. When the marina went into receivership, the estate lost its 6.53 percent interest in SevenJs, and Johnson lost his 47.87 percent interest in SevenJs and the approximately $300,000 he had invested in the business.

Under these facts, a fair-minded rational person could be persuaded to believe that Johnson breached the fiduciary duty he owed to the estate and its beneficiaries. *Bussler*, 160 Wn. App. at 460. As personal representative, he owed a fiduciary duty to all of the beneficiaries equally. *Larson*, 103 Wn.2d at 521. Johnson and his sister Judy each owned more than 47 percent of

SevenJs, along with their portion as beneficiaries to the estate's 6.53 percent share; whereas, the other two beneficiaries owned only their portion of the estate's 6.53 percent. Johnson also collected at least approximately $25,000 in management fees from the estate while SevenJs continued in operation. Accordingly, his actions with regard to SevenJs benefited himself substantially more than the other beneficiaries.

Johnson repeatedly asserts that his actions in keeping SevenJs in operation allowed the estate to avoid liability of more than $1.2 million. But that assertion seems to be in dispute, and we will not substitute our judgment for that of the fact-finder. *Bussler*, 160 Wn. App. at 461. Therefore, we hold that the superior court's finding on May 23 that Johnson breached the fiduciary duty he owed to the estate and its beneficiaries is supported by substantial evidence.

E.      NOVEMBER 7 ORDER REMOVING JOHNSON AS PERSONAL REPRESENTATIVE

Johnson argues the superior court erred in removing him as personal representative in the November 7 Order. We hold that the superior court erred in removing Johnson as personal representative in its November 7 Order because no new facts were presented to the superior court that had not been before it on May 23, yet the superior court changed its decision regarding Johnson's removal based on its erroneous adoption of Commissioner Watness's reports. *See* Section C, *supra* (holding the superior court's adoption of Commissioner Watness's reports was in error).

Between the May 23 Order, wherein the superior court refused to remove Johnson, and the November 7 Order that removed Johnson, no new facts were presented to the superior court relating to Johnson's removal. What was presented to the superior court during this time were Commissioner Watness's reports. The record does not reflect whether Commissioner Watness

considered evidence other than the evidence that was before the superior court on May 23. At the hearing on November 7, the superior court noted, "Really, there is nothing different after [Commissioner Watness's reports] than what we thought at the beginning of all of this." VRP (Nov. 7, 2014) at 16. Because nothing was different, the only reason for a reversal of the superior court's prior order regarding Johnson's removal would be Commissioner Watness's reports. Therefore, we hold that the order removing Johnson as personal representative was error because it did so based on the adoption of Commissioner Watness's reports.

In addition, Johnson argues that there was no hearing for his removal as required by RCW 11.68.070. We disagree.

RCW 11.68.070 states:

> If any personal representative who has been granted nonintervention powers fails to execute his or her trust faithfully or is subject to removal for any reason specified in RCW 11.28.250 as now or hereafter amended, upon petition of any unpaid creditor of the estate who has filed a claim or any heir, devisee, legatee, or of any person on behalf of any incompetent heir, devisee, or legatee, such petition being supported by affidavit which makes a prima facie showing of cause for removal or restriction of powers, the court shall cite such personal representative to appear before it, and if, upon hearing of the petition it appears that said personal representative has not faithfully discharged said trust or is subject to removal for any reason specified in RCW 11.28.250 as now or hereafter amended, then, in the discretion of the court the powers of the personal representative may be restricted or the personal representative may be removed and a successor appointed. In the event the court shall restrict the powers of the personal representative in any manner, it shall endorse the words "Powers restricted" upon the original order of solvency together with the date of said endorsement, and in all such cases the cost of the citation, hearing, and reasonable attorney's fees may be awarded as the court determines.

The beneficiaries respond that RCW 11.68.070 "does not specify *what kind* of hearing must precede a personal representative's removal, and [Johnson] was afforded the benefit of *a series* of

hearings" before he was removed. Br. of Resp't at 36. Specifically, the beneficiaries point to the hearings on May 2, May 23, October 3, and November 7.

The beneficiaries' argument with respect to the May 2 and May 23 hearings are not persuasive because the superior court declined to remove Johnson after those hearings. The hearing on October 3 was pursuant to the beneficiaries motion on September 25 to "(1) Confirm[] and Adopt[] Special Master Recommendations; (2) Rul[e] on Special Master Request for Instructions; (3) Direct[] Partial Distribution to Beneficiaries; and (4) Enter[] Judgment." CP at 2065 (some capitalization omitted). The caption of the September 25 motion did not request Johnson be removed, nor was the request made in the body of the September 25 motion. Accordingly, the October 3 Order did not address the possibility of Johnson's removal.

But the November 7 hearing was pursuant to the beneficiaries' motion on October 23, which requested that the superior court, among other things, "Remov[e] Personal Representative." CP at 2197, 2214. Johnson responded to the motion on November 5. Johnson's removal was argued at the November 7 hearing. Thus, Johnson's argument that "[t]here was no hearing before the trial court to remove" him, is incorrect, and his argument that there was no hearing for his removal as required by RCW 11.68.070 fails. Br. of Appellant at 38.

F.   NOVEMBER 7 JUDGMENT FOR ATTORNEY FEES

Under the holding in Section C above, we hold that the superior court erred in adopting the attorney fees Commissioner Watness recommended in his reports without complying with the procedural safeguards provided in the statutes and court rules. Accordingly, we do not address Johnson's arguments that it was improper to adopt Commissioner Watness's recommended

attorney fees award without modification, that the imposition of attorney fees not authorized by statute, and that the attorney fees awarded were unreasonable.

## G.     JUDGMENT AGAINST GAIL JOHNSON AND THE MARITAL COMMUNITY

Johnson argues that the superior court erred when it included his wife, Gail Johnson, and their marital community as judgment debtors in the various judgments entered.  Johnson's argument is premised on the assertion that TEDRA does not apply.  Therefore, we disagree.

For the reasons discussed in Section B above, TEDRA applies.  RCW 11.96A.150 is a provision under TEDRA that allows costs and attorney fees in probate to be awarded against any party.  RCW 11.96A.150(1); *Jones*, 152 Wn.2d at 20 ("Further, RCW 11.96A.150 allows costs in probate cases to any party, from any party, and is not limited by RCW 11.68.070.").

In *Jones*, our Supreme Court acknowledged the personal liability for attorney fees that personal representatives may bear for breaching their fiduciary duties to the beneficiaries.  *Id.* Therefore, naming Johnson as a judgment debtor individually liable for the breach of fiduciary duties in his capacity as a personal representative is proper.

As to whether Johnson's marital community may also be properly named as a judgment debtor, our Supreme Court explained a two prong test for marital community liability in *LaFramboise v. Schmidt*, 42 Wn.2d 198, 254 P.2d 485 (1953).  There the court said, "the community is not liable for the torts of the husband, unless the act constituting the wrong either (1) results or is intended to result in a benefit to the community or (2) is committed in the prosecution of the business of the community." *Id.* at 200.  This approach remains good law. *Clayton v. Wilson*, 168 Wn.2d 57, 65, 227 P.3d 278 (2010) ("*LaFramboise*'s approach to community liability remains good law.").

34

Applying the two prong test, we hold Johnson's personal liability extends to his marital community. Here, the act constituting the wrong was Johnson's breach of fiduciary duties in failing to wind up the SevenJs business and using estate funds to sustain the marina that SevenJs owned. Keeping the SevenJs business in existence and maintaining its ownership of the marina resulted in a benefit to the marital community because, at the very least, Johnson and his wife received monthly management fees. Therefore, Johnson's personal liability extends to his marital community.

## ATTORNEY FEES

Both parties contend they should be awarded attorney fees and costs on appeal. Johnson requests attorney fees and costs under RAP 18.1, RAP 14.2, 14.3, and RCW 11.68.070. The beneficiaries request attorney fees under RAP 18.1 and under RCW 11.96A.150(1).

Applicable to this court through RAP 18.1, RCW 11.96A.150 and RCW 11.68.070 both provide that attorney fees may be awarded at our discretion. RAP 14.2 directs costs awards "to the party that substantially prevails on appeal." And, RAP 14.3 allows this court discretion in awarding costs for "reasonable expenses actually incurred."

Here, neither party substantially prevailed in this appeal. Moreover, this appeal arose, in large part, due to an error made in the superior court's execution of its own order, for which neither party is to blame. Finally, the amount of attorney fees that both parties have incurred up to this point will impose an incredible financial burden on whomever is required to pay them on remand, and saddling one party with the other's appellate attorney fees at this juncture does not seem fair. Therefore, we decline to award attorney fees to either party for this appeal.

No. 47124-8-II

We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Worswick, J.

Bjorgen, C.J.

36